Filed 7/30/14

CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057249 |
| v. | (Super.Ct.No. FVA1001387) |
| CHRISTOPHER LONDON, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Arthur A. Harrison and Thomas S. Garza, Judges.[1] Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

[1] Judge Harrison heard the pretrial motions; Judge Garza presided over the trial.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, and Steve Oetting and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

A jury found defendant and appellant Christopher London guilty as charged of cultivating marijuana and possessing marijuana for sale. (Health & Saf. Code, §§ 11358 [cultivation], count 1; 11359 [possession for sale], count 2.)[2] Defendant was sentenced to three years' probation, subject to terms and conditions including that he serve 60 days in jail.

At trial, defendant claimed he was lawfully growing 100 marijuana plants for a medical marijuana collective under the Compassionate Use Act of 1996 (the CUA) (§ 11362.5) and the Medical Marijuana Program Act (the MMPA) (§ 11362.7 et seq.), and was therefore not guilty of unlawful marijuana cultivation (§ 11358), possession for sale (§ 11359), or the lesser included offense of marijuana possession (§ 11357).

In the nonpublished portion of this opinion, we reject defendant's claims that the court erroneously denied his motion to suppression evidence of his 100 marijuana plants and his motion to exclude un*Mirandized*[3] statements he made to police officers. In the

---

[2] All further statutory references are to the Health & Safety Code unless otherwise indicated.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

published portion, we address defendant's claims of evidentiary and instructional error concerning his lawful cultivation defense.

We first address defendant's claim that the court erroneously refused to allow his cannabis expert, William Britt, to give opinion testimony critical to his lawful cultivation defense, including that defendant was lawfully cultivating the marijuana under the MMPA and that a $20,000 sum he expected to be paid for his 100 marijuana plants, when fully grown, did not include an unlawful profit. (§ 11362.765, subd. (a) [MMPA does not allow cultivation or distribution of marijuana for profit].) We conclude the expert's testimony on these and other points was properly excluded because the expert lacked sufficient evidence to render the opinions. (Evid. Code, § 801, subd. (b).)

We then address defendant's additional claim that the court erroneously instructed the jury on his lawful cultivation defense under the MMPA. (§§ 11362.765, 11362.775.) We agree the instructions misstated the applicable law under the MMPA, but conclude defendant did not produce sufficient evidence to raise a reasonable doubt he was lawfully growing the 100 marijuana plants for himself and other qualified patients, and he was not earning a profit. Accordingly, there was insufficient evidence to support instructing the jury on defendant's MMPA defense. We therefore affirm the judgment.

## II. BACKGROUND

A. *Prosecution Evidence*

Around 1:00 a.m. on June 11, 2010, Fontana Police Officer Casey Mutter went to a house in Fontana to investigate a report of an elderly woman in the front yard calling

3

for help.  He found an elderly woman standing in the driveway with the garage door open, claiming her son, defendant, was holding her "prisoner" inside the house.  After speaking to defendant inside the house, Officer Mutter determined the woman was suffering from dementia and took her into custody pursuant to Welfare and Institutions Code section 5150.

Officer Mutter noticed an odor of marijuana as he went into the house through the pedestrian door inside the garage.  Inside the house he found defendant asleep on a bed in a bedroom.  As he woke defendant, he noticed a small amount of marijuana in a baggie on the bed and asked defendant where he got the marijuana.  Defendant said the marijuana was his, he was growing marijuana in a room in the house, and pointed to a large black tarp covering the entryway to the grow room.  Defendant showed Officer Mutter the marijuana plants, along with some "paperwork" that was attached to the wall next to the tarp.  He claimed the paperwork showed he was lawfully cultivating the marijuana for a medical marijuana collective in Malibu called the Green Galleon.

Officer Mutter contacted the narcotics unit, and Officer Joshua Rice, a narcotics officer, came to the house with two other officers.  Officer Rice smelled marijuana in the area in front of the house.  Inside the garage, he saw duct tubing used for ventilation going into the walls of the house and a "very strong[]" odor of marijuana coming through the duct tubing.  In the grow room, he saw around 100 marijuana plants growing under seven metal lamp shades, with 1,000-watt light bulbs, powered by numerous electrical cords.

4

Officer Rice sat down with defendant in the living room and spoke to him about the marijuana plants. Defendant explained he was growing the plants for the Green Galleon collective because he was having financial problems and needed to make money. He was living with and caring for his elderly mother who was on the verge of losing the house to foreclosure, he needed to provide for his ex-wife and daughter, and "just have a better lifestyle." He had spoken with his cousin, Paul Miller, about his financial problems, and Miller took him to the Green Galleon collective in Malibu. He later signed the "paperwork" to become part of the collective. Someone from the collective gave him 100 immature or "clone" marijuana plants and told him he would be paid $20,000 if he returned the plants, fully grown, to the collective. He would be reimbursed for his costs and expenses incurred in growing the plants, including his electricity bills, which he estimated would total around $4,000. He was planning to reinvest some of his $20,000 "profit" in larger grows to make larger profits. He gave his paperwork from the collective to Officer Rice, along with his physician's recommendation to use marijuana and his medical marijuana identification card.[4] Officer Rice testified that in his opinion defendant possessed the 100 marijuana plants for sale because he "was going to hand over 100 plants for $20,000."

---

[4] The parties stipulated that the 100 plants found in the house were marijuana plants and that defendant had a valid and current medical marijuana identification card.

B. *Defendant's Testimony*

In his defense, defendant testified he was growing the marijuana plants for himself and other patient-members of the Green Galleon collective. His residence was in Malibu, but he lived with his elderly mother in Fontana during most of the week and was her full-time caretaker. Five people comprised the Green Galleon collective: himself, his mother, his roommate Victor Tamayo, his cousin Paul Miller, and a man named Brian, whose last name he did not know.

After defendant told Miller he was having financial difficulties, Miller advised him he could make money growing marijuana "over a period of time." Miller provided him with 100 "clone" or "infant" marijuana plants, and he set up the indoor growing operation in his mother's Fontana house. The 100 plants were his first "grow" for a medical marijuana collective, but he had grown marijuana "for other people" in Humboldt County, among other places, during the 1970's and 1980's.

Miller was the only person from the Green Galleon collective with whom defendant had spoken concerning his growing operation. His role as a "bud tender" for the collective was to grow the plants to maturity and return them to Miller, who was to distribute them among the members of the collective and the original suppliers of the plants. Miller and Tamayo sometimes helped defendant with his growing operation by watering the plants and turning the grow lights on and off when defendant was not at his mother's house in Fontana.

6

In total, defendant had invested $10,000 in his growing operation. He did not recall telling the officers he was going to make a "pure profit" of $20,000 from growing the 100 marijuana plants and handing them over to Miller. He expected to be reimbursed for his costs of growing the plants and his labor, or time and effort involved in growing the plants, and he saw himself as an employee of the collective. He was cultivating the marijuana to become financially solvent and understood he would make his $10,000 investment back over time and several medical marijuana grows. Britt's expert testimony is discussed below.

### III. ANALYSIS/THE PRETRIAL MOTIONS

A. *The Suppression Motion Was Properly Denied*

In a pretrial motion, defendant moved to suppress the physical evidence found in his house, including the marijuana plants and lamps, the observations the officers made based on being inside his house, and his statements to the officers inside the house. (Pen. Code, § 1538.5.) The People filed a written opposition. The motion was denied following a hearing that was combined with the preliminary hearing. Defendant claims the suppression motion should have been granted because all of the challenged evidence was obtained during or as a result of a warrantless search in violation of his Fourth Amendment rights. We conclude the motion was properly denied.

1. The Evidence Adduced on the Suppression Motion

During the hearing on the suppression motion, Officer Mutter testified that around 1:00 a.m. on June 11, 2010, he was dispatched to a house in Fontana to investigate a

7

"suspicious circumstances" call. He found an elderly woman outside the house, "screaming and yelling." The woman told him that her son, defendant, was holding her "prisoner." It appeared to Officer Mutter the woman might be suffering from dementia.

Officer Mutter asked the woman for permission to enter the home, and she gave him permission. The garage door was open, and Officer Mutter went into the house through a door connecting the garage to the house. He intended to perform a "welfare check" and determine whether the woman was in a safe environment. Inside the garage, he smelled a "strong odor of marijuana."

Inside the house, Officer Mutter saw defendant lying on a bed and a small bag of marijuana on the bed. He woke defendant and asked him where he got the marijuana. Defendant said he grew the marijuana and pointed toward a room covered with an opaque, black plastic tarp. Officer Mutter looked behind the tarp and saw marijuana plants growing there. Defendant said he was lawfully growing the marijuana for a collective and produced some paperwork to support his claim.

After speaking with defendant about the woman outside the house, Officer Mutter determined the woman had Alzheimer's disease and was not being held against her will. He took her into custody pursuant to Welfare and Institutions Code section 5150.

Officer Mutter then summoned Officer Rice to the scene to determine whether the marijuana grow was lawful under California's medical marijuana laws. Officer Rice smelled marijuana from outside the house. Inside the house, Officer Rice observed 100 marijuana plants growing in the living room under metal lamp shades and 1,000-watt

8

lights. Each plant was over three feet tall and in the "budding" stage. Officer Rice estimated that an ounce of marijuana could have been harvested from each plant. The heat from the lamps was being channeled, with a fan, through air ducts leading into the garage.

Office Rice spoke to defendant inside the home in the presence of three or four other officers, some of whom were wearing plain clothes and others uniforms. Defendant was never read his *Miranda* rights and was never told he was free to leave. Defendant told Officer Rice he was growing the marijuana for a medical marijuana collective to make money because he had been having financial problems. The collective had provided him with 100 "clone" or "baby" plants to grow, and he expected to be paid $20,000 when the plants were fully grown, plus his expenses, leaving him with $20,000 "pure profit," according to Officer Rice. Defendant said he intended to use the profit to pay bills, take care of his mother and child, improve his lifestyle, and continue growing marijuana.

Defendant gave Officer Rice some paperwork which he claimed showed he was growing the marijuana for a medical marijuana collective. Aside from the quantity of marijuana plants growing in the house, the officers found no evidence indicating defendant was selling marijuana; there were no packaging materials, scales, client lists, or "pay/owe" lists. Nor was there any evidence that defendant had yet received any money for the marijuana plants.

9

2. The Trial Court's Ruling on the Suppression Motion

Following the officers' testimony, defense counsel argued the suppression motion should be granted because "there was no probable cause to search. The officer could have easily [gotten] a warrant. Any consent that was given was purely a submission to authority." Before the prosecutor could explain the People's position, the trial court denied the motion.

The court explained: "First of all, I think the officer's presence at the scene was legitimate. It was in response to a circumstance that was unknown to him at the time he responded. At the time he responded, he smells marijuana, and I think at that point further inquiry or investigation may be necessary and legitimate."

3. Analysis

In reviewing the denial of a defendant's motion to suppress evidence pursuant to Penal Code section 1538.5, we review the record in the light most favorable to the ruling and uphold the trial court's factual findings, express or implied, if substantial evidence supports them. (*People v. Superior Court (Chapman)* (2012) 204 Cal.App.4th 1004, 1011.) Based on the trial court's well-supported factual findings, we independently determine whether the search or seizure was reasonable under the Fourth Amendment (*People v. Camacho* (2000) 23 Cal.4th 824, 830, citing *People v. Leyba* (1981) 29 Cal.3d 591, 597) and what particular legal principles are relevant to this legal determination (*People v. Gemmill* (2008) 162 Cal.App.4th 958, 963).

In California, federal constitutional standards govern the admissibility evidence derived from governmental searches and seizures. (Cal. Const., art. I, § 28, subd. (f)(2); *People v. Troyer* (2011) 51 Cal.4th 599, 605; *People v. Barnes* (2013) 216 Cal.App.4th 1508, 1513.) The Fourth Amendment to the United States Constitution prohibits only unreasonable searches and seizures.[5] (*Florida v. Jimeno* (1991) 500 U.S. 248, 250; *Brigham City, Utah v. Stuart* (2006) 547 U.S. 398, 403 ["the ultimate touchstone of the Fourth Amendment is 'reasonableness'. . . ."].) A warrantless entry into a home to conduct a search or seizure is presumptively unreasonable, and the government bears the burden of establishing that exigent circumstances or another exception to the warrant requirement justified the entry. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156.)

Under the emergency aid exception to the warrant requirement, officers may enter a home without a warrant in order to render emergency assistance when the officers have an objectively reasonable basis to believe an occupant of the home is or might be seriously injured or imminently threatened with such injury. (*Brigham City, Utah v. Stuart, supra*, 547 U.S. at pp. 402-406; *People v. Gemmill, supra,* 162 Cal.App.4th at pp. 961, 964.) ""'"There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers."'"" (*People v. Panah* (2005) 35 Cal.4th 395, 465.)

---

[5] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.)

Here, the emergency aid exception justified Officer Mutter's entry into the home. As the trial court indicated, Officer Mutter had insufficient information, based solely on his initial encounter with defendant's elderly mother, to determine whether she needed emergency assistance and, if so, what kind. When Officer Mutter arrived at the house in response to a report of "suspicious circumstances," he encountered an elderly woman in the driveway with the garage door open, "screaming and yelling" and claiming her son, defendant, was holding her "prisoner" inside her "own home." Though it appeared to Officer Mutter that the woman was suffering from dementia, Officer Mutter acted reasonably in entering the house to determine whether defendant was holding the woman captive and she needed to be protected from defendant, or whether she was suffering from dementia, needed protection from herself, and should be held pursuant to Welfare and Institutions Code section 5150. Officer Mutter entered the house to conduct a "welfare check," that is, to see whether the woman was in "a safe environment."

Further, the woman gave Officer Mutter her permission to enter the house. A search based on consent is another exception to the warrant requirement. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219.) Consent to a search may be given by the defendant who later challenges the search's constitutional validity, or it may be given by "'a third party who possesses common authority over the premises' . . . ." (*People v. Superior Court (Walker)* (2006) 143 Cal.App.4th 1183, 1198.) This principle rests "'on mutual use of the property by persons generally having joint access or control . . . so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the

12

inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.'" (*People v. Bishop* (1996) 44 Cal.App.4th 220, 237.) Based on the woman's presence outside the house at 1:00 a.m. and her statement that defendant was holding her captive in her own home, Officer Mutter had reason to believe the woman lived in the house and was authorized to consent to his warrantless entry, even though she appeared to be suffering from dementia.

Defendant argues Officer Mutter violated the "knock and announce" rule by failing to knock and announce his presence and purpose before he entered the house. The "knock and announce" principle is part of the reasonableness inquiry under the Fourth Amendment. (*Wilson v. Arkansas* (1995) 514 U.S. 927, 929-930, 934.) It requires that "police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." (*Richards v. Wisconsin* (1997) 520 U.S. 385, 387.) But the police may forego the knock and announce requirement when they have "a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." (*Id*. at p. 394.)

Given the information available to him at the time he entered the house, Officer Mutter could have reasonably believed that knocking and announcing his presence and purpose would have allowed defendant to destroy any evidence he was holding the elderly woman captive. In addition, the woman's consent to allow the officer to enter the

13

house excused any requirement the officer may have otherwise had to knock and announce his presence and purpose. Under the circumstances, the officer acted reasonably in failing to knock and announce his presence and purpose before entering.

Defendant further argues any emergency had passed by the time Officer Mutter entered the house because, at that time, the woman was safely in Officer Mutter's patrol car with his partner. Her safety inside the patrol car did not obviate Officer Mutter's need to enter the house to determine whether she required emergency assistance and, if so, what kind. His lack of sufficient information to make this determination, and the woman's consent to his entry into the house, justified his warrantless entry to determine whether and, if so, what kind of emergency aid she required.[6]

In the trial court, the prosecution argued defendant effectively consented to the search of the grow room. Defendant maintains he did not freely and voluntarily consent to the search of the grow room. Instead, he argues he only told Officer Mutter he was growing marijuana behind the tarp because he had no choice but to submit to the officer's authority.

---

[6] As the court observed in *Georgia v. Randolph* (2006) 547 U.S. 103, 118: "No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or co-tenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause[.] [Citation.])"

14

When the prosecution relies upon consent to justify the lawfulness of a search, it has the burden of showing "the consent was, in fact, freely and voluntarily given." (*Bumper v. North Carolina* (1968) 391 U.S. 543, 548, fn. omitted; see also *United States v. Shaibu* (9th Cir. 1990) 920 F.2d 1423, 1426 [consent must also be "unequivocal and specific"].)  The prosecution cannot discharge its burden by showing no more than mere acquiescence to a claim of lawful authority.  (*Bumper v. North Carolina, supra,* at pp. 548-549.)  Nor can implied consent be construed from the failure of the defendant to "protest the entry."  (*People v. Superior Court* (1970) 10 Cal.App.3d 122, 127.)  The voluntariness of a person's consent to a search is question of fact to be determined from the totality of the circumstances.  (*Schneckloth v. Bustamonte, supra,* 412 U.S. at pp. 248-249.)

Substantial evidence supports the court's implied finding that defendant freely and voluntarily consented to Officer Mutter's initial search and Officer Rice's subsequent search of the grow room.  When Officer Mutter asked defendant where he obtained the marijuana in plain view on his bed, defendant claimed he was legally growing marijuana and gestured toward the room with its entryway covered by the opaque black tarp, and showed Officer Mutter paperwork supporting his claim he was legally growing the marijuana.  Construed in the light most favorable to the People, the evidence shows defendant was confident in his position he was lawfully growing the 100 marijuana plants.  He had paperwork to support his claim, posted on the wall outside the living room, and freely showed the paperwork to the officers.

15

At no time did defendant question or object to any of the officers' presence in the house or to their search of the grow room, despite having had ample time and opportunity to do so. If he had any such objections, he could have raised them at any point during his encounter with the officers, without challenging the officers' authority, but he apparently chose not to do so. Because substantial evidence supports it, we are required to uphold the court's implied finding that defendant freely and voluntarily consented to the search of the grow room. (*People v. Troyer, supra,* 51 Cal.4th at p. 605.)

Lastly, defendant claims Office Rice's subsequent entry and separate search of the grow room constituted a separate violation of his Fourth Amendment rights, in addition to and apart from the Fourth Amendment violations by Officer Mutter. He argues Officer Rice's search was not consensual for the same reason Officer Mutter's initial search was not consensual: he was merely submitting to the officers' authority. He also argues that if his mother's claim of being held captive was the initial reason for the police presence, she was secure in the patrol car and Officer Mutter had determined she was in no danger inside the home by the time Officer Rice arrived on the scene.

We disagree that Officer Rice's search violated defendant's Fourth Amendment rights. Although the emergency involving defendant's mother had passed by the time Officer Rice arrived at the house, his search was lawful for the same reason Officer Mutter's initial search was lawful: defendant impliedly consented to it. Again, the evidence, construed in the light most favorable to the trial court's denial of the suppression motion, indicated defendant was confident in his belief that he was legally

16

growing marijuana. Thus, substantial evidence supports the court's implied finding that defendant freely and voluntarily consented to each officer's search of the grow room. Just as he made no objection to Officer Mutter's initial search, defendant did not object when Officer Rice entered the house and searched the grow room. He showed Officer Rice the same paperwork supporting his legal cultivation claim that he showed Officer Mutter. On this record, defendant's implied consent to allow Officer Mutter to search the grow room extended to Officer Rice's subsequent search.

B. *The Miranda Motion Was Properly Denied*

Defendant made an oral motion in limine to exclude the statements he made to the officers at his house—including his statement to Officer Rice that he expected to earn a $20,000 "pure profit" from his medical marijuana grow—on the ground the statements were taken in violation of his *Miranda* rights. Defendant was not read his *Miranda* rights before he spoke to the officers.

The motion was denied following a hearing, and defendant's statements to the officers were admitted during the prosecution's case-in-chief. Defendant claims the motion should have been granted. We disagree. Defendant was not in custody when he made the statements and voluntarily agreed to speak with the officers.

1. Relevant Background

At the hearing on the *Miranda* motion, Officer Mutter testified that after he woke defendant he asked defendant where he obtained the small amount of marijuana in plain view on his bed and defendant told him, "I pretty much grow it myself," and gestured

17

toward the black tarp covering the living room where numerous marijuana plants were growing. Officer Mutter was in uniform when he questioned defendant, did not discuss "specifics" with him, and called the narcotics unit. At some point, Officer Mutter's partner, Officer Macias, entered the house and was also in uniform. Officer Mutter did not recall whether Officer Macias was with him when he questioned defendant.[7] After Officer Mutter saw the marijuana plants, defendant showed him paperwork supporting his claim he was growing the marijuana for a medical marijuana collective. Officer Mutter agreed defendant "wasn't free to just walk away" after Officer Mutter saw the marijuana plants and called the narcotics unit. Still, Officer Mutter did not handcuff defendant or place him in custody.

When Officer Rice arrived, he contacted defendant in the living room. He was wearing plain clothes, and there were two other officers wearing plain clothes and two officers in uniform. He did not read defendant his *Miranda* rights before he questioned him. He told defendant he was not under arrest and he "just wanted to talk to him about his marijuana grow."

When asked whether defendant could have "just walked out of the house, walked away from you and the other officers," Officer Rice responded: "[I]f he had somewhere to go, he could have gone. I told him he wasn't going to be placed under arrest at that time, and he agreed to speak with me. He was in his house, so he didn't really appear to

---

**7** It was unclear whether other officers had arrived outside and were taking care of defendant's mother by the time Officer Mutter's partner, Officer Macias, entered the house.

18

have anywhere to go.  But if he said he needed to leave, we could have wrapped up our investigation, and he could have left."

Officer Rice asked defendant about his relationship with the collective and how its growers were compensated.  Defendant did not appear nervous and was not arrested following the interview.  The trial court denied the motion, finding defendant was not in custody or "in a custodial setting" when he spoke to the officers.

2.  Analysis

"*Miranda* advisements are only required when a person is subjected to custodial interrogation.  [Citation.]  A suspect is in custody when a reasonable person in the suspect's position would feel that his 'freedom of action is curtailed to a "degree associated with formal arrest." [Citation.]' [Citation.]" (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 35 [Fourth Dist., Div. Two].)  "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation . . . ." (*Stansbury v. California* (1994) 511 U.S. 318, 322.)

Though no single factor is dispositive of the custody determination, relevant factors include:  "'(1)  [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.'" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403.)

Additional factors include:  "[W]hether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the

person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview." (*People v. Pilster, supra,* 138 Cal.App.4th at pp. 1403-1404.)

In reviewing a trial court's ruling on a motion to exclude statements based on a *Miranda* violation, "'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 385.)

Substantial evidence supports the trial court's determination that defendant was not in custody when he was questioned by Officer Mutter and later by Officer Rice. Accordingly, no *Miranda* advisements were necessary. Though Officer Mutter testified defendant was not free to leave after he discovered the marijuana plants, there is no indication that Officer Mutter told defendant he was not free to leave. (*Stansbury v. California, supra,* 511 U.S. at p. 325 ["An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned"].) Officer Mutter did not place defendant in handcuffs, and there was no evidence he restricted defendant's movement in any way. Nor was there any evidence

20

Officer Mutter was aggressive, confrontational, or accusatory toward defendant, or told defendant he was a suspect in a criminal investigation. Officer Mutter questioned defendant for no more than one minute, then contacted the narcotics unit.

Before Officer Rice questioned defendant, he told defendant he was not going to be placed under arrest at that time, and he "just wanted to talk to him about his marijuana grow." According to Officer Rice, defendant agreed to speak with him. Though Officer Rice questioned defendant in the presence of four other officers, there was no testimony that any of the officers were aggressive, confrontational, or accusatory toward defendant, or pressured defendant to answer any questions. (Cf. *United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1078-1079, 1083 [presence of numerous armed officers to execute search warrant turned suspect's home into "police-dominated atmosphere" amounting to custody for purposes of *Miranda*].) As Officer Rice promised, defendant was not taken into custody following Officer Rice's interview, and it does not appear the interview was lengthy.

Though Officers Mutter and Rice questioned defendant in his home in the middle of the night after he was unexpectedly awakened by Officer Mutter, and it appears defendant had nowhere else to go, the totality of the circumstances indicates defendant was not in custody and could have refused to answer the officers' questions without being taken into custody. In sum, "the interplay and combined effect of all the circumstances," "on balance," did not "create[] a coercive atmosphere such that a reasonable person

21

would have experienced a restraint tantamount to an arrest." (*People v Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)

## IV.  ANALYSIS/MMPA ISSUES

A.  *Summary of California's Medical Marijuana Laws*

    1.  <u>The CUA</u>

In the November 1996 general election, California voters passed Proposition 215, an initiative statute titled Medical Use of Marijuana.  The measure added section 11362.5, the Compassionate Use Act of 1996, to the Health and Safety Code.  (*People v. Mower* (2002) 28 Cal.4th 457, 463; § 11362.5, subd. (a).)  The CUA grants patients and their primary caregivers limited immunity from state criminal prosecution, including a defense at trial, for two marijuana-related offenses:  possession (§ 11357) and cultivation (§ 11358).  (*People v. Mower, supra,* at pp. 470, 474; *People ex rel. Lungren v. Peron* (1997) 59 Cal.App.4th 1383, 1392 (*Peron*).)  The CUA provides:  "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."  (§ 11362.5, subd. (d).)

The CUA's limited immunity from state criminal prosecution for unlawful marijuana possession and cultivation applies *solely* to qualified patients and their primary caregivers who possess or cultivate marijuana for *the patient's* personal use.  (*People v. Mower, supra,* 28 Cal.4th at pp. 474-475.)  As one court has explained, the CUA is a

22

"*narrowly drafted* statute designed to allow a qualified patient and his or her primary caregiver to possess and cultivate marijuana for *the patient's* personal use . . . ." (*People v. Urziceanu* (2005) 132 Cal.App.4th 747, 772-773 (*Urziceanu*), italics added.) The court reasoned: "The use of the singular identifying the patient and primary caregiver as the person privileged to engage in the identified conduct and the term 'personal medical purposes' suggests the Compassionate Use Act was designed for a single patient to grow or possess his or her own marijuana, or to have that marijuana possessed or grown for him or her by his or her caregiver. While a primary caregiver could care for and cultivate more than one patient's marijuana, this language lends no support to defendant's contention that 'patients' and their 'caregivers' can collectively pool talents, efforts, and money to create a stockpile of marijuana that is to be collectively distributed." (*Id.* at p. 768.)[8]

## 2. The MMPA

In 2003, the Legislature enacted the MMPA (§ 11362.7 et seq.) in response to the CUA's stated purpose, among others, to "encourage the federal and state governments to

---

[8] The CUA defines a "primary caregiver" as "the individual designated by the person exempted under this section [i.e., a qualified patient] who has consistently assumed responsibility for the housing, health, or safety of that person." (§ 11362.5, subd. (e); see *People v. Mentch* (2008) 45 Cal.4th 274, 283.) A person does not qualify as a primary caregiver merely by having a qualified patient designate him or her as such or by providing a patient with medical marijuana. (*Id.* at pp. 283-285.) A person asserting primary caregiver status must prove "at a minimum that he or she (1) consistently provided caregiving [to a qualified patient], (2) independent of any assistance in taking medical marijuana, (3) at or before the time he or she assumed responsibility for assisting with medical marijuana." (*Id.* at p. 283.)

implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." (§ 11362.5, subd. (b)(1)(C); *Urziceanu, supra,* 132 Cal.App.4th at pp. 782-783.) The MMPA did not amend the CUA; it is a separate, legislative scheme that implements the CUA. (*People v. Hochanadel* (2009) 176 Cal.App.4th 997, 1012-1013; *County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 829-831.)

The MMPA "expressly expands the scope of the [CUA] beyond the qualified defense to cultivation and possession of marijuana" to possession of marijuana for sale (§ 11359) among other offenses. (*Urziceanu, supra,* 132 Cal.App.4th at p. 784.) In contrast to the more restrictive CUA, the MMPA "contemplates the formation and operation of medicinal marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that marijuana." (*Id.* at p. 785; see §§ 11362.765,11362.775.) The MMPA "abrogated" pre-MMPA case law, including *Peron, supra,* 59 Cal.App.4th 1383, to the extent that case law "took a [more] restrictive view" of the activities allowed by the CUA than the MMPA. (*Urziceanu, supra,* at p. 785.)[9]

The MMPA seeks to "[e]nhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects." (Stats. 2003, ch. 875,

---

[9] "At the heart of the MMPA is a voluntary 'identification card' scheme that, unlike the CUA—which . . . provides only an *affirmative defense* to a charge of possession or cultivation—*provides protection against arrest* for those and related crimes." (*People v. Kelly* (2010) 47 Cal.4th 1008, 1014.)

24

§ 1(b)(3), pp. 6422-6423.)  To this end, section 11362.775 of the MMPA provides:

"Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357 [possession of marijuana], 11358 [cultivation], 11359 [possession for sale], 11360 [transportation], 11366 [maintaining a place for the sale, giving away or use of marijuana], 11366.5 [making available premises for the manufacture, storage or distribution of controlled substances], or 11570 [abatement of nuisance created by premises used for manufacture, storage or distribution of controlled substances]."

The MMPA defines a "qualified patient" as "a person who is entitled to the protections of [the CUA] but who does not have an identification card" issued pursuant to the MMPA.  (§ 11362.7, subd. (f).)  The MMPA contains guidelines limiting the amount of "dried marijuana" a qualified patient or qualified primary caregiver may possess and the number of "mature" and "immature" plants these persons may maintain or cultivate for the qualified patient (§ 11362.77) but, as applied, these limits cannot be less than the amount of marijuana necessary to meet the qualified patient's current medical needs. (*People v. Kelly, supra,* 47 Cal.4th at pp. 1043-1049.)

The MMPA does not allow qualified patients, valid identification cardholders, or their primary caregivers to earn a profit from the cultivation or distribution of medical

marijuana, whether through a cooperative, collective, or otherwise.  Section 11362.765 states:  "(a)  Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be subject, on that sole basis, to criminal liability under Section 11357, 11358, 11359, 11360, 11366, 11366.5 or 11570.  However, nothing in this section shall authorize the individual to smoke or otherwise consume marijuana unless otherwise authorized by this article, *nor shall anything in this section authorize any individual or group to cultivate or distribute marijuana for profit.*"  (Italics added.)[10]

Together, sections 11362.765 and 11362.775 of the MMPA plainly allow qualified patients, valid identification cardholders, and their primary caregivers to pool their efforts and resources to cultivate marijuana for the qualified patients and holders of valid identification cards, in amounts necessary to meet the reasonable medical needs of the

---

[10]  Subdivision (b) of section 11362.765 states:  "Subdivision (a) shall apply to all of the following:  [¶]  (1)  A qualified patient or a person with an identification card who transports or processes marijuana for his or her own personal medical use.  [¶]  (2)  A designated primary caregiver who transports, processes, administers, delivers, or gives away marijuana for medical purposes, in amounts not exceeding those established in subdivision (a) of Section 11362.77, only to the qualified patient of the primary caregiver, or to the person with an identification card who has designated the individual as a primary caregiver.  [¶]  (3)  Any individual who provides assistance to a qualified patient or a person with an identification card, or his or her designated primary caregiver [§ 11358] in administering medical marijuana to the qualified patient or person or acquiring the skills necessary to cultivate or administer marijuana for medical purposes to the qualified patient or person."  Subdivision (c) of section 11362.765 states:  "(c)  A primary caregiver who receives compensation for actual expenses, including reasonable compensation incurred for services provided to an eligible qualified patient or person with an identification card to enable that person to use marijuana under this article, or for payment for out-of-pocket expenses incurred in providing those services, or both, shall not, on the sole basis of that fact, be subject to prosecution or punishment under Section 11359 [possession for sale] or 11360 [transportation]."

26

qualified patients and cardholders—without being subject to criminal sanctions for, among other offenses, unlawful marijuana possession (§ 11357), cultivation (§ 11358), or possession for sale (§ 11359)—provided they do not earn a profit from the cultivation, distribution, or sale of the medical marijuana.

  3. The Guidelines

  Section 11362.81, subdivision (d) of the MMPA directs the California Attorney General to "develop and adopt appropriate guidelines to ensure the security and nondiversion of marijuana grown for medical use by patients qualified under the [CUA]." In 2008, the California Attorney General, Edmund G. Brown, Jr., Department of Justice, issued "Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use" (Guidelines).  The Guidelines are not binding on the courts but are entitled to "considerable weight."  (*People v. Colvin* (2012) 203 Cal.App.4th 1029, 1040, fn. 11; *People v. Hochanadel, supra,* 176 Cal.App.4th at p. 1011.)

  The Guidelines are intended to serve several purposes:  "(1) ensure that marijuana grown for medical purposes remains secure and does not find its way to non-patients or illicit markets, (2) help law enforcement agencies perform their duties effectively and in accordance with California law, and (3) *help patients and primary caregivers understand how they may cultivate, transport, possess, and use medical marijuana under California law*."  (Guidelines, p. 1, italics added.)  The Guidelines observe:  "Under California law, medical marijuana patients and primary caregivers may 'associate within the State of

27

California in order collectively or cooperatively to cultivate marijuana for medical purposes.' (§ 11362.775.)" (Guidelines, § IV, p. 8.)

In order to help cooperatives and collectives operate within the law, the Guidelines require that "[a]ny group that is collectively or cooperatively cultivating and distributing marijuana for medical purposes should be organized and operated in a manner that ensures the security of the crop and safeguards against diversion for non-medical purposes." (Guidelines, § IV.A., p. 8.) A group organized as a nonprofit, agricultural cooperative must comply with applicable provisions of the Corporations Code and the Food and Agricultural Code. For example, the group must "file articles of incorporation with the state and conduct its business for the mutual benefit of its members." (Guidelines, § IV.A.1., p. 8.)

Regarding collectives, which unlike cooperatives are neither statutorily defined nor governed by statute, the Guidelines state: "California law does not define collectives, but the dictionary defines them as 'a business, farm, etc., jointly owned and operated by the members of a group.' [Citation.] Applying this definition, a collective should be an organization that merely facilitates the collaborative efforts of patient and caregiver members - including the allocation of costs and revenues. As such, a collective is not a statutory entity, but as a practical matter it might have to organize as some form of business to carry out its activities. The collective should not purchase marijuana from, or sell to, non-members; instead, it should only provide means for facilitating or coordinating transactions between members." (Guidelines, § IV.A.2., p. 8.)

28

Cooperatives and collectives must be "Non-Profit Operation[s]" (Guidelines, § IV.B.1, p. 9) and "should acquire marijuana only from their constituent members, because only marijuana grown by a qualified patient or his or her primary caregiver may lawfully be transported by, or distributed to, other members of a collective or cooperative (§§ 11362.765, 11362.775). *The collective or cooperative may then allocate it to other members of the group.* Nothing allows marijuana to be purchased from outside the collective or cooperative for distribution to its members. Instead, the cycle should be a closed-circuit of marijuana cultivation and consumption with no purchases or sales to or from non-members. To help prevent diversion of medical marijuana to non-medical markets, *collectives and cooperatives should document each member's contribution of labor, resources, or money to the enterprise. They should also track and record the source of their marijuana.*" (Guidelines, § IV.B.4., p. 10, italics added.)

In accordance with section 11362.765 of the MMPA, the Guidelines provide that medical marijuana grown at a collective or cooperative may be "a) Provided free to qualified patients and primary caregivers who are members of the collective or cooperative; [¶] b) Provided in exchange for services rendered to the entity; [¶] c) Allocated based on fees that are reasonably calculated to cover *overhead costs and operating expenses*; or [¶] d) Any combination of the above." (Guidelines, § IV.B.6., p. 10, italics added.) Thus, "[a]ny monetary reimbursement that members provide to the collective or cooperative should only be an amount necessary to cover overhead costs and operating expenses." (*People v. Hochanadel, supra,* 176 Cal.App.4th at pp. 1010-1011.)

29

B.  *The Expert Testimony of the Defense Cannabis Expert Was Properly Limited*

    1.  <u>Background</u>

William Britt was the executive director of the Association of Patient Advocates, a grassroots organization he formed 15 years earlier to help persons with mental and physical disabilities gain access to services and alternative treatments.  He had a high school education and "some training" and experience in accounting, but no medical, legal, or horticultural degrees.  He had spoken about medical marijuana to medical professionals, law enforcement agencies, city councils, and other groups, and had testified as a cannabis expert over 50 times in Los Angeles County.  He was the only cannabis expert whom the Los Angeles County Superior Court considered qualified to be appointed to assist indigent criminal defendants in Los Angeles County.  He had testified as an expert on the particular issue of "compensation to growers" "at least 20, 30 times," and he was a medical marijuana patient himself.

The prosecution moved in limine to prevent Britt from testifying about the indicia of lawfully operating medical marijuana collectives, their costs of cultivating marijuana, and their methods of compensating their members for cultivation services performed for the collective.  At an Evidence Code section 402 hearing, Britt testified there were "[a]t least a thousand" medical marijuana collectives in California.  When asked how a medical marijuana collective differs from a cooperative, if at all, Britt responded that cooperatives are legally defined entities; they must have a board of directors and must operate in accordance with certain rules.  In contrast, collectives are not legally defined,

30

are "generally more loosely operated" than cooperatives, and "one collective can be very different than another collective."

Britt had heard of the Green Galleon collective in Malibu through advertisements and through speaking to medical marijuana patients who may have been members of the collective, but he knew nothing about its methods of operation. He did not know who ran the collective, how many members it had, how the labor of running the collective was divided among its members, or where or how the collective obtained its marijuana. His understanding of defendant's relationship with the collective was based entirely on defendant's representations; he had not spoken to anyone at the collective to verify defendant's membership or relationship with the collective. Britt agreed that, due to his lack of knowledge about the Green Galleon's methods of operation, he could not offer an opinion whether it was operating as a lawful medical marijuana collective or not.

At the hearing on the in limine motion, defendant argued his lawful cultivation defense was based on "how collectives operative" and "[w]hether or not services are reimbursed." Relying on *Urziceanu, supra,* 132 Cal.App.4th 747, he argued the law allowed him to cultivate marijuana as a member of a collective and receive reasonable compensation for his services. The trial court took a restrictive view of the permissible scope of Britt's testimony, and ruled he could not testify "regarding any salary or reimbursement for participating as a marijuana grower or a collective . . . ." Relying on a pre-MMPA case, *Peron, supra,* 59 Cal.App.4th 1383, the court ruled the subjects of "compensation or salary, reimbursement" to members of a marijuana collective were "off

31

the table" because the law prohibited the sale or possession for sale of marijuana "even as a nonprofit organization."

As additional support for its ruling, the court noted there appeared to be "no set rules" governing how medical marijuana collectives could lawfully operate, and a "great variance" in the ways collectives operated. But the court found even "more troubling" Britt's admission that he lacked information concerning the Green Galleon's methods of operation and consequent inability to opine whether the collective was lawfully operating under California's medical marijuana laws. Given Britt's lack of information about the Green Galleon's methods of operation, the prosecutor argued Britt would "speculate wildly" about whether defendant was lawfully cultivating marijuana for the collective. The court agreed, saying: "I don't know how [Britt] can possibly opine what specifics may have been related to their setup, their operation, their labor, their numbers, their members, those types of things." Based on his other qualifications, the court ruled Britt could testify whether there were any indications defendant was selling marijuana or possessed the 100 marijuana plants for sale. The court also ruled Britt could testify "as a patient advocate" concerning defendant's personal use of marijuana as a "pain management" strategy, if a proper foundation were laid for that testimony.

In his subsequent testimony before the jury, Britt indicated his knowledge of compensation and reimbursement for expenses incurred in cultivating medical marijuana was based on his interviews of "hundreds if not thousands" of medical marijuana patients concerning how, why, and when they used marijuana, and how they cultivated marijuana.

He had "visited numerous cultivation sites and collectives," and had consulted with attorneys, mostly defense attorneys.

The court sustained numerous prosecution objections and refused to allow Britt to testify concerning compensation lawfully paid to and expenses reasonably incurred by persons who grow marijuana for medical marijuana collectives. The court also ruled Britt did not lay a sufficient evidentiary foundation to opine that the 100 marijuana plants defendant was growing would produce no more marijuana than necessary to supply the needs of a collective comprised of six medical marijuana patients. Nor was he qualified to render any legal opinions, including on the legal distinctions between unlawful and lawful marijuana cultivations. The court clarified: "If he wants to testify to his own personal use, if he wants to testify, again, as to being a patient advocate with respect to his personal knowledge about [defendant] and his purported use, he can go there. But he is not to testify about these other issues that call for legal opinions on areas that are outside and not relevant to our concern."

Britt later testified that an average medical marijuana patient consumes about three to six pounds of marijuana per year, and a collective would therefore need to produce 18 to 36 pounds of marijuana per year to supply marijuana for six members. When asked how much usable marijuana defendant's 100 marijuana plants would likely produce, Britt testified that would be hard to determine because the yield from indoor-grown plants depends greatly on the quantity and quality of the indoor lighting the plants receive. Finally, Britt testified that in his experience it typically costs $3,000 to produce one

pound of marijuana, and the initial cost to establish a "seven-light grow setup" such as defendant's would be around $7,000 to $10,000.

2. Analysis

Defendant claims the court's limitations on Britt's expert testimony deprived him of his due process right to present critical evidence on his lawful cultivation defense. "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." (*California v. Trombetta* (1984) 467 U.S. 479, 485.) This means that states must afford a defendant "a meaningful opportunity to present a complete defense" to criminal charges. (*Ibid*.) A defendant is denied that opportunity when the state is permitted "'to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence,'" absent a valid justification for excluding the evidence. (*Montana v. Egelhoff* (1996) 518 U.S. 37, 53, citing *Crane v. Kentucky* (1986) 476 U.S. 683, 690-691.)

But here, defendant does not identify what testimony Britt could have *competently* given but was precluded from giving concerning his lawful cultivation defense. (Evid. Code, § 801, subd. (b) [expert opinion testimony is limited to opinion based on matter perceived by, personally known to, or made known to the expert at or before the hearing].) Britt admitted he knew nothing about the Green Galleon collective's methods of operation, who ran it, how many members it had, how the labor of running it was divided among its members, or how its members obtained marijuana. Britt had not spoken to anyone at the collective to verify defendant's membership in it or relationship

34

with it.  Given his lack of personal knowledge or other information concerning its operations, Britt agreed he could not competently opine that the Green Galleon collective was lawfully operating as a medical marijuana collective under the MMPA.  (See Evid. Code, § 801, subd. (b).)

In addition, Britt lacked a sufficient evidentiary foundation to opine that defendant was not earning an unlawful profit for cultivating the 100 marijuana plants for the collective.  (§ 11362.765, subd. (a) [persons may not profit from sale or distribution of medical marijuana]; Guidelines, § IV.B.6., p. 10 [medical marijuana may be allocated among members of medical marijuana collective or cooperative "based on fees that are reasonably calculated to cover overhead costs and operating expenses"].)  Defendant's statements to the officers and trial testimony did not provide the necessary evidentiary foundation.

Though defendant denied telling Officer Rice he expected to earn a $20,000 "pure profit" from his 100-plant marijuana grow, and he only expected to make money growing marijuana "over a period of time," he never explained how much he expected to earn from his 100-plant grow and any additional "grows" for the collective.  Nor did he estimate the amount of time and effort he had invested and expected to invest in his 100-plant grow and in his planned additional grows, or tie that amount of time and effort to the amount of compensation he expected to earn for cultivating marijuana for his collectve.  (Guidelines, § IV.B.4., p. 10 ["[C]ollectives and cooperatives should document each member's contribution of labor, resources, or money to the enterprise."].)

35

To be sure, defendant estimated he had invested $10,000 in his lights and other growing equipment and he testified he expected to be reimbursed for that amount and his other out-of-pocket costs and expenses incurred in growing the marijuana (e.g., his electricity bills), *in addition* to being paid for the marijuana plants he was growing. But there was no evidence tying the reasonable value of defendant's cultivation services to the amount of compensation he expected to be paid for his marijuana plants. Accordingly, there was no evidentiary basis for Britt to opine defendant was not earning an unlawful profit for cultivating and distributing—i.e., selling—his marijuana plants to the collective. By the same token, Britt had no evidentiary basis to opine that the $20,000 defendant told Officer Rice he expected to be paid for his 100 plants, when fully grown, plus his out-of-pocket costs incurred in growing the plants, was reasonably calculated to cover no more than his "overhead costs and operating expenses," including the reasonable value of his labor and services rendered in cultivating the plants. (Guidelines, § IV.B.6., p. 10.)

Britt also lacked a sufficient evidentiary foundation to opine that the 100 plants defendant was currently cultivating would produce no more marijuana than necessary to supply the current medical needs of a collective comprised of six qualified patients, including defendant. (§ 11362.77; *People v. Kelly, supra,* 47 Cal.4th at p. 1049.) Although Britt testified an average medical marijuana patient consumes three to six pounds of marijuana per year, and a collective comprised of six qualified patients would need 18 to 36 pounds of marijuana per year, he could not estimate how much marijuana

36

defendant's 100 plants would produce. He said the yield from indoor-grown plants depends greatly on the quantity and quality of indoor lighting the plants receive, and he had no evidence about the quantity or quality of lighting the 100 plants were receiving. Thus, by his own admission, Britt could not reasonably estimate the amount of marijuana defendant's 100 plants would produce, or whether that amount exceeded 18 to 36 pounds per year, the amount he indicated was necessary to meet the reasonable medical needs of six *average* qualified patients.[11]

Defendant criticizes the court's reliance on the pre-MMPA case, *Peron,* in ruling Britt could not testify on the subjects of "compensation or salary, reimbursement" to qualified patients of a medical marijuana collective in exchange for their services rendered and costs incurred in cultivating marijuana for the collective. *Peron* correctly pointed out that *the CUA* does not allow marijuana to be sold, even "on an allegedly nonprofit basis." (*Peron, supra,* 59 Cal.App.4th at p. 1392.) Still, we agree the court's reliance on *Peron* was misplaced.

The MMPA abrogated *Peron* and other pre-MMPA cases to the extent the cases construed the CUA more restrictively than the subsequently-enacted MMPA allows.

---

[11] It is unclear from the record whether the Green Galleon collective was comprised of six members, as defendant indicated, or whether defendant only knew of six members, including himself, and the collective actually had many more members. It appears from Britt's testimony that the collective had many more members, but there was no solid, reliable evidence that it did. Britt had only *heard of* the collective through advertisement and by speaking with persons he said *may have* been members, but he did not know how many members it had. Thus, the only competent evidence presented was that the collective was comprised of six persons, including defendant.

(*Urziceanu, supra,* 132 Cal.App.4th at p. 785.) The MMPA and the Guidelines allow nonprofit groups comprised of qualified patients, valid medical marijuana identification cardholders, and their respective primary caregivers, if any, *to pay each other and receive compensation and reimbursement from each other* in amounts necessary to cover the "overhead costs and operating expenses" incurred in cultivating and providing medical marijuana to qualified patient members of the group. (§§ 11362.765, 11362.775; Guidelines, § IV.)

As defendant points out, appellate court decisions issued following his August 2012 trial have acknowledged, at least implicitly, that the MMPA and the Guidelines allow qualified patients and persons holding valid identification cards to be paid reasonable compensation for cultivating marijuana for other qualified patients. (See, e.g., *People v. Jackson* (2012) 210 Cal.App.4th 525, 537 [the Guidelines "appear to contemplate that collectives and cooperatives will dispense [i.e., sell] marijuana and that that there will be an exchange of cash consideration"]; *People ex rel. City of Dana Point v. Holistic Health* (2013) 213 Cal.App.4th 1016, 1020, 1026-1027 [summary judgment against marijuana dispensary for nuisance abatement and illegal business practices improper where substantial evidence showed dispensary was operating as nonprofit enterprise]; *People v. Colvin, supra,* 203 Cal.App.4th at p. 1039 [not all members of

38

medical marijuana cooperative or collective must participate in cultivating marijuana for other members].)**12**

Nevertheless, *Jackson*, *Colvin*, and *Holistic Health* do not assist defendant's claim that the court erroneously limited Britt's expert testimony. Notwithstanding its misplaced reliance on *Peron*, the court did not abuse its discretion in refusing to allow Britt to offer his expert opinion that defendant was only earning reasonable compensation and was not earning an unlawful profit on his 100-plant medical marijuana grow. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 828 [court's decision to exclude evidence is reviewed for an abuse of discretion]; *Lent v. Tillson* (1887) 72 Cal. 404, 422 [a court abuses its discretion when it fails to follow the law and apply appropriate criteria in determining the admissibility of evidence].) As discussed, Britt had no evidentiary foundation to offer that opinion, and he admitted he could not competently opine that the Green Galleon collective was lawfully operating under state law.

---

**12** We agree with the observation in *People ex rel. Trutanich v. Joseph* (2012) 204 Cal.App.4th 1512, 1523 that: "Section 11362.765 allows reasonable compensation for services provided to a qualified patient or person authorized to use marijuana," but we disagree with the qualifying phrase, "*but such compensation may be given only to a 'primary caregiver.'*" (*Ibid.*, italics added.) Nothing in section 11362.765 or the Guidelines indicates that *only primary caregivers* may receive reasonable compensation for cultivating marijuana for a nonprofit group of qualified medical marijuana patients. Rather, groups comprised solely of qualified patients may grow medical marijuana for each other, provided they do not earn a profit on their cultivation services rendered or their expenses incurred. (§ 11362.765.)

C. *Insufficient Evidence Supported Defendant's Lawful Cultivation Defense*

Defendant claims he was denied a fair trial because the court misinstructed the jury on his lawful cultivation defense under the MMPA. We agree the instructions did not accurately state the law applicable to defendant's defense that he was lawfully cultivating marijuana under the MMPA. Nevertheless, the errors were not prejudicial because the evidence was insufficient to raise a reasonable doubt defendant was not earning a profit on his medical marijuana cultivation operation.

1. The Relevant Instructions

The jury was instructed that unlawful possession of marijuana (§ 11357) was a lesser included offense to the unlawful cultivation (§ 11358) and possession for sale (§ 11359) charged in counts 1 and 2, respectively. In substantially similar language, the jury was instructed on how defendant's lawful cultivation defense applied to the unlawful cultivation and possession for sale charges.

On how the lawful cultivation defense applied to the unlawful cultivation charge in count 1, the jury was instructed: "Possession or cultivation of marijuana is lawful if authorized by the [CUA]. The [CUA] allows a person to possess or cultivate marijuana (for personal medical purposes or as the primary caregiver of a patient with a medical need) when a physician has recommended or approved such use. The amount of marijuana possessed or cultivated must be reasonably related to the patient's current medical needs. The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess or cultivate marijuana for medical purposes.

40

If the People have not met this burden, you must find the defendant not guilty of this crime. [¶] A primary caregiver is someone who has consistently assumed responsibility for the housing, health, or safety of a patient who may legally possess or cultivate marijuana." (CALCRIM No. 2370.)

On how the lawful cultivation defense applied to the possession for sale charge in count 2, the jury was instructed: "Possession of marijuana is lawful if authorized by the [CUA]. The [CUA] allows a person to possess marijuana for personal medical purposes or as the primary caregiver of a patient with a medical need when a physician has recommended or approved such use. The amount of marijuana possessed must be reasonably related to the patient's current medical needs. The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess the marijuana for medical purposes. If the People have not met this burden, you must find the defendant not guilty of this crime. [¶] A primary caregiver is someone who has consistently assumed responsibility for the housing, health, or safety of a patient who may legally possess or cultivate marijuana." (CALCRIM No. 2375.)

The court further instructed the jury in the language of section 11263.775: "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357, 11358, 11359, 11360, 11366, 11366.5 or 11570. [¶] You

41

have heard evidence that the defendant possessed a valid medical marijuana recommendation from a physician.  [¶]  Simple possession of marijuana is lawful under the [CUA] and the [MMPA] if a person has a valid physician's recommendation. *Possession for sale, and the actual sale of marijuana is not lawful even if a person has a valid medical marijuana recommendation from a physician.*  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant possessed marijuana with the intent to sell."  (Italics added.)

The jury was further instructed on a mistake of fact defense:  "The defendant is not guilty of possession for sale of marijuana if he did not have the intent or mental state required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact.  [¶]  If the defendant's conduct would have been lawful under the facts as he reasonably believed them to be, he did not commit possession for sale of marijuana.  If you find the defendant believed that he was being reimbursed by a co-op or a collective and if you find that belief was reasonable, he did not have the specific intent or mental state required for possession for sale of marijuana.  [¶]  If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for possession for sale of marijuana, you must find him not guilty of that crime."  (CALCRIM No. 3406.)

2.  <u>Analysis</u>

We review a court's instructions de novo to determine whether they correctly state the law or effectively direct a finding adverse to the defendant by removing an issue from

the jury's consideration. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Our task is to determine whether the trial court '"fully and fairly instructed on the applicable law." [Citation.]' [Citation.]" (*People v. Lopez* (2011) 198 Cal.App.4th 698, 708.) In determining whether the jury was fully and fairly instructed on the applicable law, we consider the instructions as a whole and each in light of the others. (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.) We also consider the entire trial record, including the arguments of counsel, and assume the jurors understood and correlated all of the instructions. (*People v. Lopez, supra,* at p. 708.)

The instructions did not accurately state the law supporting defendant's lawful cultivation defense, essentially because the instructions were based on the CUA, not the MMPA. The CUA does not contemplate the lawful cultivation or sale of medical marijuana through nonprofit organizations. Instead, it allows a patient and his or her primary caregiver to grow or possess marijuana *solely* for *the patient's* medical purposes, *and for no other persons or groups of persons*. (*Urziceanu, supra,* 132 Cal.App.4th at p. 768.) In contrast, the MMPA allows qualified patients, valid identification cardholders, and their respective primary caregivers, if any, to form nonprofit groups, and through those groups, pay *each other and receive compensation and reimbursement from each other* in amounts necessary to cover the "overhead costs and operating expenses" of cultivating and providing medical marijuana to the qualified patient and valid cardholder members of the group. (§§ 11362.765, 11362.775; Guidelines, § IV; see *People v. Jackson, supra,* 210 Cal.App.4th at p. 537 [MMPA does not limit number of qualified

43

patient members a medical marijuana cooperative or collective may have]; *People v. Colvin, supra,* 203 Cal.App.4th at p. 1039 [not all members of cooperative or collective must participate in cultivating marijuana for other members].)

The instructions erroneously told the jury that in order to find defendant was lawfully cultivating the 100 marijuana plants—and was therefore not guilty of unlawful cultivation (§ 11358) or possession for sale (§ 11359)—it had to find he was either the primary caregiver for the other alleged five members of the Green Galleon collective or was growing no more marijuana than necessary for his own medical use. In this respect, the instructions comported with the CUA but were contrary to the MMPA.

The instructions also erroneously stated: "*Possession for sale, and the actual sale of marijuana is not lawful even if a person has a valid medical marijuana recommendation from a physician.*" (Italics added.) Though nothing in the MMPA allows any individual or group to cultivate or distribute marijuana for profit (§ 11362.765, subd. (a)), the Guidelines allow marijuana grown through a nonprofit collective or cooperative to be "[a]llocated based on fees that are reasonably calculated to cover overhead costs and operating expenses[.]" (Guidelines, § IV.B.6., p. 10; see also § 11362.775.)

Nothing in the other instructions or the arguments of counsel cured these instructional errors. Nonetheless, there was insufficient evidence to support defendant's lawful cultivation defense; thus, defendant was not entitled to instructions on the defense. When a defendant claims he or she was lawfully cultivating marijuana under the MMPA

44

(§§ 11362.765, 11362.775) as a defense to marijuana-related charges including unlawful cultivation (§ 11358) and possession for sale (§ 11359), the defendant has the burden of *producing evidence* sufficient to raise a reasonable doubt of his guilt. (*People v. Mower, supra,* 28 Cal.4th at pp. 476-482; *People v. Jackson, supra,* 210 Cal.App.4th at p. 533.) The trial court is required to instruct sua sponte on a defense only if substantial evidence supports it, the defendant is relying on it, and it is consistent with the defendant's theory of the case. (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 49.)

*People v. Solis* (2013) 217 Cal.App.4th 51 is instructive. Solis and other defendants operated a 1,700-member medical marijuana dispensary, the Healing Center (THC), out of a storefront in Santa Barbara. THC was not registered as nonprofit. Several of its customers reported they became members by filling out a form, and they had no involvement with the dispensary other than purchasing marijuana there. (*Id.* at p. 54.) In one year, Solis received $80,000 in income from THC and spent it on family expenses and entertainment. He purchased marijuana from unidentified sources and resold it to the dispensary for double the price he paid. Other venders also sold marijuana to THC, and Solis knew some of those vendors used false names to avoid "legal problems." Police tracked down one vendor who was not a member of the dispensary. (*Id.* at pp. 54-55.)

The trial court rejected Solis's MMPA defense in a bench trial, finding there was insufficient evidence to raise a reasonable doubt whether THC was operating on a nonprofit basis. (*People v. Solis, supra,* 217 Cal.App.4th at p. 56.) The court reasoned in

45

part: "Monetary reimbursement that members provide to [a] collective or cooperative is limited to an amount necessary to cover overhead costs and operating expenses. [Guidelines, § IV.B.6., p. 10.] Defendants have provided no evidence of actual overhead costs or expenses that had to be reimbursed. Rather, the reimbursement amount or, as Solis described it, pricing was simply double the amount [THC] paid for [the] marijuana." (*Ibid*.) The trial court also found there was no evidence that THC members "pooled money" to collectively grow marijuana, and no evidence that the monies paid to THC went into collective cultivation of marijuana. To the contrary, the evidence showed the revenues went to vendors, many of whom were unknown and two of whom were not members of THC, and to Solis for his "entertainment and living expenses." (*Ibid*.)

The trial court found Solis guilty of possessing marijuana for sale (§ 11359) and a misdemeanor count of selling or transporting marijuana (§ 11360, subd. (a); *People v. Solis, supra,* 217 Cal.App.4th at p. 54). The appellate court agreed there was insufficient evidence to support Solis's MMPA defense that he was lawfully cultivating marijuana for a nonprofit collective, and affirmed the judgment. (*People v. Solis, supra,* at p. 59.)

Here, too, the evidence supporting defendant's lawful cultivation defense fell short of raising a reasonable doubt that defendant was lawfully cultivating and lawfully possessing marijuana for sale, on a nonprofit basis, to a lawfully operating marijuana collective. First, there was insufficient evidence that the Green Galleon collective was lawfully operating a nonprofit medical marijuana collective comprised solely of qualified patients, valid identification cardholders, or their primary caregivers. (§§ 11362.765,

46

11362.775; Guidelines, § IV.)  With the exception of defendant, there was no evidence that any of the collective's other five members were qualified patients.  (§ 11362.7, subd. (f).)  Nor was there any evidence that the collective was registered, organized, or operating as a nonprofit organization (see Guidelines, § IV.A.2., p. 8) or that it was organized with sufficient structure to ensure nondiversion of marijuana to illicit markets (Guidelines, § IV.B., pp. 9-11).  Defendant testified that half of the marijuana he harvested from his 100-plant grow would be given to his cousin Miller, the person from the collective who provided him with the 100 "clone" plants, but there was no evidence that *any* of the marijuana harvested from defendant's grow would be given for free or sold, on a nonprofit basis, *solely* to qualified patient members of the collective.

Lastly, defendant asserts a "clear and accurate instruction stating a medical marijuana patient is entitled to reimbursement an[d] compensation for cultivating for the collective was required."  We disagree.  Such an instruction would have been too broadly worded and therefore misleading, because it would not have limited the amount of permissible reimbursement to the amount of out-of-pocket costs incurred in cultivating the marijuana, nor would it have limited the amount of permissible compensation to the *reasonable value* of the cultivation services rendered.  Under the MMPA, a qualified patient or valid identification cardholder is entitled to receive only *reasonable* compensation for his labor or services rendered in cultivating medical marijuana for other qualified patient members of his nonprofit group, plus reimbursement for his out-of-

47

pocket expenses incurred, but he *may not earn a profit* from growing medical marijuana.

(§ 11362.765; Guidelines, § IV.B.1., B.6., pp. 9-10.)

## V.  DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

KING
                                                                                    J.

We concur:

McKINSTER
            Acting P. J.

CODRINGTON
            J.

48