Filed 1/9/15

## CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JERRY TRENT ANDERSON,<br><br>    Defendant and Appellant. | F066737<br><br>(Super. Ct. No. CRF36522)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County. James A. Boscoe, Judge.

Ean Vizzi and Amanda Millea for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

Defendant Jerry Trent Anderson was convicted of one count of cultivating marijuana. His contentions in this appeal are: (1) the court failed to instruct the jury correctly on Anderson's defense under the medical marijuana laws; and (2) evidence of the marijuana should have been excluded, and the information dismissed, because the

police did not adhere to statutory evidence-preservation requirements when they destroyed all but some samples of the plants they seized from Anderson's property.

We agree with the first argument and will reverse. The jury instructions failed to explain clearly the defense potentially available to Anderson under Health and Safety Code section 11362.775, which legalizes the operation of cooperatives and collectives for cultivation of marijuana by groups of patients. Specifically, the instructions did not make it clear that a lawful cooperative or collective can consist of some patient members who grow marijuana and other patient members who compensate the growers with money in exchange for marijuana. In light of the evidence, the arguments made to the jury by counsel, and the fact that there was a splintered verdict (consisting of a conviction on one count, an acquittal on another, and a hung jury on a third), we conclude it is reasonably probable that this deficiency in the instructions confused the jury and affected the outcome.

We reject the second argument. Anderson has failed to show that any error in the evidence-preservation procedures was prejudicial.

### FACTS AND PROCEDURAL HISTORY

In 2011, Detective Eric Erhardt of the Tuolumne County Sheriff's Department was investigating a marijuana dispensary called Foothill Care Collective. The sheriff's department raided the dispensary on May 25, 2011, and closed it. The dispensary's principals were convicted of offenses pursuant to plea agreements.[1] In the course of the investigation, Detective Erhardt found business records indicating that Anderson sold marijuana with a value of $3,000 through the dispensary on consignment in 2010 and

---

[1] This court subsequently reversed those convictions on procedural grounds, permitted the defendants to withdraw their pleas, and remanded the cases to the superior court. (*People v. Schuller* (Nov. 21, 2013, F064799) [nonpub. opn.], 2013 Cal.App. Unpub. LEXIS 8391 (*Schuller*); *People v. Brisco* (Nov. 25, 2013, F064802) [nonpub. opn.], 2013 Cal.App. Unpub. 8509 (*Brisco*).)

2011.  The sheriff's department conducted aerial surveillance of Anderson's property and saw marijuana growing there.

On August 23, 2011, deputies searched Anderson's property pursuant to a search warrant.  They removed 187 growing marijuana plants from the ground.  Inside the house, they found concentrated cannabis in powder and liquid forms, some rolled marijuana cigarettes, and about 25 bags and jars each containing about an ounce of dried marijuana.  One room contained a "grow light" and some rings where pots apparently had been, indicating that the marijuana plants might have been started there.  Also found were approximately $50 in cash on the kitchen table and $970 in cash in Anderson's pocket.  Three loaded handguns were found in the bedroom, as well as a shotgun and two rifles.  Two more rifles were in a closet in the living room.

Posted outdoors near the marijuana plants were two medical recommendations for marijuana use.  One was for Anderson and the other was for Jason Roberts, Anderson's son-in-law.  The recommendation for Anderson stated that he could have "more than eight oz and up to 99 plants."  The recommendation for Roberts stated that Roberts could have "up to 99 … mature flowering cannabis plants and … up to 5 … pounds dried cannabis flowers."  Detective Erhardt, however, believed the marijuana could not be legitimate medical marijuana because the quantity was too large, there was packaged marijuana, and there had been sales to the dispensary.

The sheriff's department seized all the money in Anderson's personal bank account and the bank account Anderson used for his plumbing business, which had revenue of $120,000 to $190,000 per year.  None of the money had been returned at the time of trial.[2]  According to Detective Erhardt, 60 percent of the forfeited assets would be retained by the sheriff's department and 10 percent by the district attorney's office.

---

[2] After trial, as part of a plea agreement to resolve the mistried count 2, the parties agreed that Anderson would forfeit $8,000 of the seized funds and the remainder, $6,743.12, would be returned.

The district attorney filed a complaint, which was later deemed an information, alleging three counts: (1) cultivating marijuana (Health & Saf. Code, § 11358);[3] (2) possession of marijuana for sale (§ 11359); and (3) possession of concentrated cannabis (§ 11357, subd. (a)). In connection with each count, the complaint alleged for purposes of sentence enhancement that Anderson was armed with three handguns. (Pen. Code, § 12022, subd. (a)(1).)

Before trial, Anderson filed a motion to dismiss pursuant to Penal Code section 1385. The motion argued that the sheriff's department had destroyed all the marijuana except for samples and, in taking the samples, had failed to comply with Health and Safety Code section 11479.

Section 11479 provides:

"Notwithstanding Sections 11473 and 11473.5, at any time after seizure by a law enforcement agency of a suspected controlled substance, that amount in excess of 10 pounds in gross weight may be destroyed without a court order by the chief of the law enforcement agency or a designated subordinate. Destruction shall not take place pursuant to this section until all of the following requirements are satisfied:

"(a) At least five random and representative samples have been taken, for evidentiary purposes, from the total amount of suspected controlled substances to be destroyed. These samples shall be in addition to the 10 pounds required above. When the suspected controlled substance consists of growing or harvested marijuana plants, at least one 10 pound sample (which may include stalks, branches, or leaves) and five representative samples consisting of leaves or buds shall be retained for evidentiary purposes from the total amount of suspected controlled substances to be destroyed.

"(b) Photographs have been taken which reasonably demonstrate the total amount of the suspected controlled substance to be destroyed.

---

[3] Subsequent statutory references are to the Health and Safety Code unless indicated otherwise.

4.

"(c) The gross weight of the suspected controlled substance has been determined, either by actually weighing the suspected controlled substance or by estimating that weight after dimensional measurement of the total suspected controlled substance.

"(d) The chief of the law enforcement agency has determined that it is not reasonably possible to preserve the suspected controlled substance in place, or to remove the suspected controlled substance to another location. In making this determination, the difficulty of transporting and storing the suspected controlled substance to another site and the storage facilities may be taken into consideration.

"Subsequent to any destruction of a suspected controlled substance pursuant to this section, an affidavit shall be filed within 30 days in the court which has jurisdiction over any pending criminal proceedings pertaining to that suspected controlled substance, reciting the applicable information required by subdivisions (a), (b), (c), and (d) together with information establishing the location of the suspected controlled substance, and specifying the date and time of the destruction. In the event that there are no criminal proceedings pending which pertain to that suspected controlled substance, the affidavit may be filed in any court within the county which would have jurisdiction over a person against whom those criminal charges might be filed."

Anderson's motion argued that the People's response to his informal discovery request revealed inadequate compliance with this statute. Anderson stated that the samples listed in the police report were never provided to the defense; the photographs taken were too small and did not show all the plants seized; and the method used to weigh the seized plants was not disclosed. The affidavit filed by the sheriff's department pursuant to section 11479 stated that 187 plants were seized, weighing "approximately 150 pounds gross wet weight including stalks," and that the same day, 174 plants weighing approximately 142 pounds were destroyed "at a remote location." This affidavit did not include any recitations about samples or photographs, did not state that the sheriff had made a determination that it was not reasonably possible to preserve the evidence, and did not say whether the weight was determined by weighing or measuring. Anderson argued that the sheriff's department's noncompliance was prejudicial because it

prevented a determination of the quality, sex and maturity of the plants, which in turn prevented a determination of the quantity of usable marijuana that could be prepared from them. This would undermine his ability to raise a reasonable doubt about whether the quantity in his possession exceeded a reasonable amount for medical use by an individual or a collective.

The People's opposition to the motion stated that five random samples and an estimated 10-pound sample consisting of eight plants were taken in accordance with section 11479. The photographs of the plants "reasonably demonstrated the total …." The samples "are available to the defendant for whatever purpose he requires." If the pictures were too small, Anderson could enlarge them, and he would be given access to the sheriff's department's computer system to do so. Further, the appropriate remedy for a prejudicial failure to comply with section 11479 was suppression of evidence, not dismissal of the information. The opposition also remarked that, at the time of his arrest, Anderson expressed the "mistaken belief that it was legal to sell marijuana to dispensaries."

At the hearing on the motion, Anderson argued that the prosecution had the burden of demonstrating compliance with section 11479 and had not shown that the samples were representative. The People argued that they believed they had complied. No evidence was presented at the hearing. The court denied the motion without explanation.

At trial, Anderson testified that he was 53 years old, was a licensed plumbing contractor, and had spent his working life operating his plumbing business. He had a number of health issues arising from accidents. In 1985, he was electrocuted and suffered burns, nerve damage, and brain damage. He was unable to work for five years after this accident. He was in car accidents in 1997 and 2008. In the second of these, he suffered a brain injury, a compression injury to his chest affecting a number of internal organs, and injuries to his back, hip, knees, and feet. After the 2008 car accident, he decided to try medical marijuana for back pain and muscle cramps related to his injuries. He obtained a

physician's recommendation for medical marijuana in 2008, and it remained current at the time of trial.

Dr. Daniel Shadoan, Anderson's physician, testified. He said that, in addition to injuries caused by accidents, Anderson had a genetic rheumatological autoimmune condition called ankylosing spondylitis. This was Anderson's primary medical issue. The condition causes pain and stiffening of the joints and can lead to fusion of the spine. The conventional treatment of this condition employs medications that suppress the immune system and can cause severe side effects. Dr. Shadoan provided ongoing osteopathic treatment for Anderson's condition. He was not involved with Anderson's use of medical marijuana and was not the doctor who issued Anderson's marijuana recommendation, but he acknowledged that marijuana had helped with Anderson's pain and also alleviated the severe insomnia which he had suffered since the electrical shock.

Anderson testified about the intended uses of the growing plants and the processed marijuana found on the property. He said he was in the process of forming a medical marijuana collective for himself, his domestic partner Susan Silva, his son-in-law Jason Roberts, and two other men. Thirty other people planned to join "as soon as we became official." Anderson planned to provide the marijuana from the plants to himself and Silva and then to the other collective members if there was enough. Incorporation of the collective was completed a week after Anderson's arrest.

The processed and packaged marijuana found in the house was from previous years and was for Anderson and Silva. Anderson usually ground his marijuana into powder and placed it in capsules for swallowing because he did not like the feeling of intoxication that comes from smoking. He used about two ounces a week. The concentrated cannabis had come from a collective in San Francisco, and Anderson used it for severe attacks of pain and stiffness. Regarding the guns, Anderson testified that all of them were registered, that he had had a hunting license every year since he was 16, and

that he kept some of them loaded because he had problems with bears, coyotes, and other wild animals on the property. The guns were not used to further marijuana cultivation.

Anderson testified that he consigned marijuana to Foothill Care Collective and received $3,000 for it. He said he did this because his medical recommendation at the time allowed him to keep only five pounds. When his plants produced more than five pounds of processed marijuana, he consigned the excess to the collective, believing that he was doing so lawfully.

Daniel Welsh, Jeremy Caswell, Anthony Chastain, Silva, and Roberts all testified about their connections with the marijuana. Welsh testified that Anderson was growing some of the marijuana for Welsh's medical use. He had a physician's recommendation for marijuana and he expected Anderson's plants would supply his needs of one-half ounce to one ounce per week for a year. He was not going to buy the marijuana from Anderson, but instead planned to reimburse him for his costs. He did not help grow the plants.

Caswell testified that he understood Anderson was forming "a co-op" and he planned to join it once it was formed. Caswell had a physician's recommendation for marijuana use. He had never bought marijuana from Anderson. He assumed he would reimburse Anderson for costs when the co-op was established.

Chastain testified that he and Anderson were planning to form a lawful medical marijuana co-op together and that it was going to be called the Billy Redfish Care Collective. Chastain's role would be "to manage the crew, deal with the employees," meaning the people who would work in the store, while Anderson handled the cultivation. He and Anderson had researched the law, investigated possible types of corporate entities to use, and begun looking for a building and insurance. Their first discussions took place two or three years before the seizure but did not lead to the actual efforts just described until August 2011, the month when the seizure took place. The efforts came to a halt when Anderson was arrested. Some of the seized marijuana was to be used to stock the

collective, but Chastain was not involved in the growing of it and had not obtained any marijuana from Anderson. He was not a medical marijuana patient. His understanding of the business side of a medical marijuana collective was that it had to be organized as a nonprofit corporation and could not earn profit, but that employees could receive wages and collective members could receive some form of proceeds.

Silva, 66 years old at the time of trial, was a medical marijuana patient, though she allowed her physician's recommendation to lapse between April 2011 and August 2011. She used marijuana to treat neck pain and pain related to multiple surgeries. She did not help grow Anderson's plants, but she intended to use some of the marijuana that they would yield and expected that her needs would be supplied from the yield for 10 months to a year. The processed marijuana found in the house was partly for her use as well. She had never purchased marijuana from Anderson. She sometimes purchased marijuana from a dispensary in San Francisco. As far as she knew, the total number of plants growing in the yard was within the sum of the two, 99-plant limits of Anderson's and Roberts's medical recommendations.

Roberts testified that he was a medical marijuana patient with a physician's recommendation to use marijuana. Half the plants Anderson was growing at the time of the seizure were for his use. Anderson also had grown about 20 marijuana plants for Roberts's medical use the previous year. Roberts had once or twice come to the property to help in planting and tending the plants. He supplied some cloned plants to start the crop that was seized. He believed the half of the plants that were not for him were for the collective Anderson was starting.

Documents relating to the formation of the collective were found in the house by the deputies. There was a form from the California Secretary of State for forming a nonprofit corporation, a business card reading "Billy Redfish, vendor, delivery co-op," and some papers for registering a domain name that included the words Billy Redfish.

9.

Jason Brisco testified about Foothill Care Collective. Foothill Care Collective was a collective formed to cultivate and distribute medical marijuana. Brisco was president of the corporation and administrator of the collective. Anderson was a member. The collective was formed in 2009 or 2010 and had a city business license, a state seller's permit, and a federal employer identification number. The membership included patient users, patient growers, and patients' primary caregivers. Members had to submit written membership applications. Prices set for marijuana provided for sale by grower members were based on the grower's costs plus reasonable compensation for his or her time. Sales of grower members' marijuana were conducted pursuant to consignment agreements, like the one between the collective and Anderson. The collective was a nonprofit entity. All income was paid to growers or used to pay building rent and other business expenses. No marijuana was sold to nonmembers, and members signed an agreement not to resell marijuana to nonmembers.

Foothill Care Collective was raided and closed by the sheriff's department on May 25, 2011. As noted above, its principals were prosecuted and two of them (Brisco and Rhett Schuller) were convicted pursuant to plea agreements. Brisco testified that he and Schuller agreed to plead no contest in exchange for the dismissal of charges against Brisco's father and the corporation's secretary.

This court reversed the convictions of Brisco and Schuller because the plea agreements included a reservation of the right to appeal from the trial court's pretrial ruling that they were not entitled to jury instructions on defenses under California's medical marijuana laws. This reservation rendered the agreements invalid. It was beyond the power of the trial court to bargain with them to preserve, for appellate purposes, issues that were eliminated by their guilty pleas as a matter of law. (*Brisco, supra*, 2013 Cal.App. Unpub. LEXIS 8509 at p. *11; *Schuller, supra,* 2013 Cal.App. Unpub. LEXIS 8391 at p. *11.) We remanded with directions to allow Brisco and Schuller to withdraw their pleas. (*Brisco, supra*, at p. *13; *Schuller, supra*, at p. *13.)

As in this case, the defense involved protections for those who form collectives or cooperatives to cultivate and distribute marijuana. We did not reach the question of whether Brisco and Schuller were entitled to instructions on this defense (*Brisco, supra,* 2013 Cal.App. Unpub. LEXIS 8509 at p. *3; *Schuller, supra*, 2013 Cal.App. Unpub. LEXIS 8391 at p. *3), although a concurring opinion concluded that the trial court was mistaken in its view that the defense was available only to primary caregivers (*Brisco, supra,* at pp. *20-24 (conc. opn. of Gomes, J.); *Schuller, supra*, at pp. *20-24 (conc. opn. of Gomes, J.).)

Anderson's marijuana expert, Christopher Conrad, testified about the quantity of usable marijuana the seized plants were likely to have yielded. He explained that male plants do not produce usable medical marijuana, and usable marijuana generally comes from the mature flowers of a female plant, although some usable product can sometimes be derived from leaves. Based on his examination of the photographs taken by the sheriff's department, Conrad concluded that most of the plants were not mature and that the sex characteristics they would exhibit were not yet determined. Most of them, however, would probably turn out to be female. He could not tell from the photographs how many plants were flowering. The yield of the plants would be affected by the fact that the garden was crowded and the plants blocked the sunlight from each other. Insects and mold would take a portion of the crop. Conrad did not inspect the sample plants preserved by the sheriff's department.

Based on the reported weight of the removed plants, using a formula employed by the Drug Enforcement Administration, and taking account of additional growth of the immature plants and likely insect and mold losses, Conrad opined that the garden would probably have yielded 10 to 12 pounds of usable medical marijuana. Anderson's own estimate was five to eight pounds. Conrad testified that a single patient using marijuana on an ongoing basis might use as little as three pounds or as much as nine pounds in a year.

11.

Conrad also opined that the quantity of processed marijuana found in the house was consistent with medical use for one to five people. The packaging of small quantities was consistent with use by a collective, as it is easier to keep track of how much each member has used if the collective's supply is divided into small quantities. Marijuana also keeps longer if it is packaged and stored in smaller quantities. The concentrated forms found in the house also were consistent with medical use. The evidence of sale via consignment to a dispensary was consistent with cultivation or possession for a medical purpose, as dispensaries generally require proof of medical marijuana patient status from both buyers and sellers. Similarly, the evidence of efforts to form a corporate entity was indicative of intent to cultivate for medical purposes, as an illegal commercial grower would have no reason to incorporate. Further, a commercial grower would be unlikely to take a check, as Anderson had taken from Foothill Care Collective. There also were no pay-owe sheets, no complaints about foot traffic at the house, and no evidence of any selling or providing of marijuana to nonpatients.

Rebutting Conrad's testimony, Detective Erhardt opined that the seized plants could yield at least half a pound of processed marijuana per plant, which would be more than 90 pounds of processed marijuana and nearly 10 times Conrad's estimate.

The jury instruction on cultivating marijuana stated that Anderson was guilty of that offense if the prosecution proved that he unlawfully cultivated one or more marijuana plants and knew that they were marijuana plants. The instruction further stated:

> "Possession or cultivation of marijuana is lawful if authorized by the Medical Marijuana Laws. The Medical Marijuana Laws allow a person to possess or cultivate marijuana for personal medical purposes when a physician has recommended or approved such use. The amount of marijuana possessed or cultivated must be reasonably related to the patient's current medical needs. The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess or cultivate marijuana for medical purposes. If the People have not met this burden, you must find the defendant not guilty of this crime."

12.

Additional instructions on Anderson's medical marijuana and medical marijuana collective defenses were as follows:

"A person is a qualified patient if he or she has a written or oral approval from a physician for the medical use of marijuana.

"Qualified patients claiming protection under the law may possess an amount of marijuana that is reasonably related to their current medical needs.

"The question of whether medical use of marijuana is appropriate for a patient's illness is a determination to be made by a physician. The possession of a written recommendation by a patient creates a presumption he or she is a qualified medical marijuana patient.

"Selling or furnishing marijuana to people who do not have a medical marijuana recommendation remains prohibited under the medical marijuana laws.

"The medical marijuana laws allow a person to cultivate, possess, and transport the amount of marijuana that is reasonably related to the patient's current medical needs. Possession of marijuana in excess of this limit is not authorized by the medical marijuana laws.

"If you find that the defendant committed acts that were outside the protection of the medical marijuana laws, he is subject to the full force and effect of the criminal law.

"Qualified patients who associate within the State of California in order, collectively or cooperatively, to cultivate marijuana for medical purposes, shall not solely on the basis of that fact, be subjected to state criminal sanctions under Sections 11357, 11358, and 11359.

"To establish the collective/cooperative defense, a defendant must show:

"One: Qualified patients have associated within the State of California in order, collectively or cooperatively, to cultivate marijuana for medical purposes; and

"Two: The amount of marijuana possessed or cultivated is reasonably related to the needs of the patients of the collective.

13.

"The burden is on the defendant to merely raise a reasonable doubt as to the medical marijuana defense. However, if the defendant raises a reasonable doubt as to the medical marijuana defense, the People then have the burden to prove beyond a reasonable doubt that the defendant was not acting lawfully.

"A qualified patient must have obtained a recommendation or approval to use medical marijuana prior to the date of arrest. However, that recommendation need not specify an approved dosage or amount of marijuana that may be possessed or cultivated. A qualified patient is not required to periodically renew his recommendation or approval regarding the medical marijuana use or cultivation."

In his closing argument, the prosecutor asserted that the only real issue in the case was whether Anderson's medical marijuana defense should prevail. In contending that it should not, the prosecutor emphasized that, on the one hand, financial transactions had taken place, while on the other, the witnesses other than Anderson had not done work in the garden. Further, there arguably were more plants than the individuals themselves needed. Finally, the prosecutor argued that the jury instructions did not say that it is legal to sell medical marijuana, and in fact meant the opposite; so when Anderson claimed he was following the law when he received money for marijuana sold on consignment through Foothill Care Collective, he was merely asserting that he made a mistake of law, which is not a defense.

Defense counsel argued that there was no evidence of sales to anyone except for the consignment sales through Foothill Care Collective, and no evidence that this sale was unlawful. Detective Erhardt testified that Anderson said he sold marijuana to a collective in San Jose, but Anderson denied saying this.

In his rebuttal argument, the prosecutor again implied that any type of sale was unlawful, saying, "If he is outside of the medical marijuana laws, going to sell marijuana or do anything that is outside of the medical marijuana laws, again, he's guilty." The prosecutor also said, "Remember, you can't sell. Jury instruction says you can't sell to anyone."

14.

The jury found Anderson guilty of count 1 (cultivation) and not guilty of count 3 (possession of concentrated cannabis). It found the firearm allegation not true. It could not reach a verdict on count 2 (possession of marijuana for sale) and the court declared a mistrial on that count.

Anderson entered into a plea agreement on the mistried count. He pleaded guilty to a reduced charge, a misdemeanor violation of section 11366 (maintaining a place to give away or sell marijuana). He does not appeal from the conviction on this plea.

The court suspended imposition of sentence and granted five years' probation. The conditions of probation included a 90-day jail term, of which 30 days were to be served in actual custody and 60 under electronic monitoring. At the sentencing hearing, the People continued to emphasize their view that all sales are unlawful, arguing that time in actual custody was appropriate because "he's been selling. He knows he's been selling."

## *DISCUSSION*

### I.    *Background on medical marijuana law*

In 1996, the voters approved Proposition 215, enacting the Compassionate Use Act (CUA) (Prop. 215, § 1, as approved by electors, Gen. Elec. (Nov. 5, 1996) adding § 11362.5, subd. (a).) The CUA decriminalized possession and cultivation of marijuana by patients with a physician's recommendation and those patients' primary caregivers:

> "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5, subd. (d).)

The stated purposes of the CUA are: "To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use has been deemed appropriate and has been recommended by a physician …"; "[t]o ensure that patients and their primary caregivers who obtain and use marijuana for medical

15.

purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction"; and "[t]o encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." (§ 11362.5, subd. (b)(1).)

In 2003, the Legislature enacted the Medical Marijuana Program (MMP), also sometimes called the Medical Marijuana Program Act (MMPA) (§§ 11362.7 et seq.). The MMP contains numerous provisions for the orderly administration of the policies declared by the CUA. One purpose of the MMP—of importance in this case—is to protect collectives and cooperatives organized for the cultivation of marijuana for medical use. An uncodified section of the legislation states that one of the Legislature's goals was to "[e]nhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects." (Stats. 2003, ch. 875, § 1(b)(3).) To this end, the law includes section 11362.775, which provides a defense for collective or cooperative cultivation:

> "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified persons and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570." (§ 11362.775.)

Panels of the Second, Third, and Fourth District Courts of Appeal have rejected the view that the operation of a nonprofit business involving exchange of marijuana for money between members of a collective or cooperative remains prohibited despite section 11362.775. In *People v. Urziceanu* (2005) 132 Cal.App.4th 747 (*Urziceanu*), the Third District held that, although the CUA provided no defense to a charge of conspiracy to sell marijuana for a defendant accused of operating a cooperative to cultivate and distribute (for money) marijuana to patients with medical marijuana recommendations,

16.

section 11362.775 did create such a defense. (*Urziceanu, supra,* at pp. 759-762, 767, 785.) The court explained:

> "[T]he Legislature … exempted those qualifying patients and primary caregivers who collectively or cooperatively cultivate marijuana for medical purposes from criminal sanctions for possession for sale, transportation or furnishing marijuana, maintaining a location for unlawfully selling, giving away, or using controlled substances, managing a location for the storage, distribution of any controlled substance for sale, and the laws declaring the use of property for these purposes a nuisance.

> "This new law represents a dramatic change in the prohibitions on the use, distribution and cultivation of marijuana for persons who are qualified patients or primary caregivers and fits the defense defendant attempted to present at trial. Its specific itemization of the marijuana sales law indicates it contemplates the formation and operation of medicinal marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that marijuana. Contrary to the People's argument, this law did abrogate [cases taking] a restrictive view of the activities allowed by the [CUA]." (*Urziceanu, supra,* 132 Cal.App.4th at p. 785.)

The court reversed the conspiracy conviction and remanded for a new trial to allow the jury to determine whether the defendant's "cooperative falls within the parameters of section 11362.775." (*Urziceanu, supra,* 132 Cal.App.4th at pp. 786-787.)

In their brief opposing Anderson's motion to set aside the information pursuant to Penal Code section 995, the People maintained that if *Urziceanu* "implies that monetary transactions are immunized based on the statutory construction of section 11362.775, this analysis was superseded by the Supreme Court's statutory construction of MMP immunities in" *People v. Mentch* (2008) 45 Cal.4th 274. *Mentch,* however, does not address section 11362.775 at all. The facts of *Mentch* bear some similarity to the facts in the case—Mentch was a medical marijuana patient who cultivated marijuana for himself and also distributed it to several other patients—but there was no evidence that Mentch was part of any collective or collectives; no defense under section 11362.775 was attempted or argued for. Instead, Mentch made, and the Supreme Court rejected, an

17.

argument that he fell within the protections of a different defense (§ 11362.765) for primary caregivers and those who assist patients in administering marijuana and acquiring cultivation skills. (*Mentch, supra*, at pp. 290-292.) A court's opinion is not authority for a proposition not considered in it. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.)

In *People v. Hochanadel* (2009) 176 Cal.App.4th 997 (*Hochanadel*), the defendants were operators of a storefront medical marijuana dispensary charged with possession of marijuana for sale, transportation of marijuana, and maintaining a business for the purpose of selling marijuana. (*Id.* at pp. 1002-1004.) The Fourth District reversed an order to quash a search warrant and also reversed the resulting dismissal of the charges, but its analysis in reaching this result included an assertion that storefront dispensaries qualifying as cooperatives or collectives can operate free of criminal liability under section 11326.775. (The question was germane because one of the issues the court had to decide was whether probable cause existed to support the search warrant in light of the existence of the section 11326.775 defense.) (*Hochanadel, supra,* at pp. 1002-1003, 1016-1017.) The court stated:

> "[I]f a storefront dispensary managed by primary caregivers or medical marijuana patients is truly operating as a cooperative or collective, it and its operators might have a defense to arrest and prosecution under section 11362.775. Nothing in section 11362.775, or any other law, prohibits cooperatives and collectives from maintaining places of business." (*Hochanadel, supra*, 176 Cal.App.4th at p. 1018.)

In *People v. Colvin* (2012) 203 Cal.App.4th 1029 (*Colvin*), William Colvin was convicted of transporting marijuana after a pound of marijuana, which he was moving from one of his medical marijuana dispensary's locations to its other location, was found in his car. (*Id.* at p. 1032.) The dispensary operated by Colvin was a nonprofit corporation that had 5,000 patient members, of whom 14 grew marijuana. The nongrower members bought marijuana at the dispensary. The corporation used the revenue to pay its expenses, including reimbursement to the growers and a salary for

18.

Colvin. (*Id.* at p. 1033.) The trial court ruled that the defense in section 11362.75 did not apply. (*Colvin, supra,* at p. 1032.)

The Second District reversed. It rejected the Attorney General's view that a defendant cannot use the defense if the involvement of most of the cooperative's or collective's members is limited to buying marijuana grown by other members, as opposed to engaging in some more comprehensive kind of united action or participation. The Court of Appeal explained that cooperative corporations organized under California law typically operate in a similar way:

> "The Attorney General [maintains] that a medical marijuana cooperative seeking the protections of section 11362.775 must establish that some number of its members participate in the process in some way. The Attorney General does not specify *how* many members must participate or in *what* way or ways they must do so, except to imply that [Colvin's dispensary], with its 5,000 members and 14 growers, is simply too big to allow any 'meaningful' participation in the cooperative process; hence, it cannot be a 'cooperative' or a 'collective' in the way section 11362.775 intended. But this interpretation of section 11362.775 would impose on medical marijuana cooperatives requirements not imposed on other cooperatives. A grocery cooperative, for example, may have members who grow and sell the food and run a store out of which the cooperative's products are sold. But not everyone who pays a fee to become a member participates in the cooperative other than to shop at it." (*Colvin, supra*, 203 Cal.App.4th at p. 1039.)

In *People v. Jackson* (2012) 210 Cal.App.4th 525 (*Jackson*), Jovan Jackson was charged with sale of marijuana and possession of marijuana for sale. (*Id.* at p. 529.) He and five others cultivated marijuana and distributed it to a collective having about 1,600 other members. (*Ibid.*) The trial court ruled that he could not present a defense under section 11362.775 even though the collective's members were qualified patients and the collective was not operated for profit. The trial court found "that in light of the large number of members of the collective, Jackson could not establish that the collective was operated for the purpose of collectively cultivating marijuana within the meaning of the

19.

MMPA as opposed to simply distributing marijuana." Jackson was convicted. (*Jackson, supra,* at p. 529.)

The Fourth District reversed. In its view, the trial court was mistaken in its belief that the collective was unprotected by the statute because its business model involved a small number of grower members cultivating for a large number of consumer members who paid for the marijuana, as opposed to a homogeneous group who all participated in cultivation together:

> "The defense the MMPA provides to patients who participate in collectively or cooperatively cultivating marijuana requires that a defendant show that members of the collective or cooperative: (1) are qualified patients who have been prescribed marijuana for medicinal purposes, (2) collectively associate to cultivate marijuana, and (3) are not engaged in a profit-making enterprise. As we interpret the MMPA, the collective or cooperative association required by the act need not include active participation by all members in the cultivation process but may be limited to financial support by way of marijuana purchases from the organization." (*Jackson, supra*, 210 Cal.App.4th at pp. 529-530.)

The Fourth District revisited the issue of sales among and between members of medical marijuana cooperatives and collectives in *People v. London* (2014) 228 Cal.App.4th 544 (*London)* and *People v. Baniani* (2014) 229 Cal.App.4th 45 (*Baniani*). In *London*, a jury instruction concerning section 11362.775 was found to be erroneous because it incorrectly stated that the actual sale of marijuana is not lawful even if a person has a valid medical marijuana recommendation from a physician. (*London, supra*, 228 Cal.App.4th at p. 563.) The opinion explains that under the MMP, a qualified patient or valid identification cardholder may not earn a profit from growing or distributing medical marijuana, but such individuals are entitled to receive reasonable compensation and reimbursement of out-of-pocket expenses for labor or services rendered in cultivating medical marijuana for other qualified members of lawfully operating nonprofit cooperatives and/or collectives to which they belong. (*Id*. at p. 564-566.) In *Baniani*, the appellate court reversed a defendant's conviction of possessing marijuana for sale due to

the trial court's erroneous refusal to allow the defendant to assert a defense under section 11362.775. The panel held that section 11362.775 "was written to provide a defense to a charge of selling marijuana in appropriate circumstances," and further opined that a contrary interpretation of the statute would defeat the stated purpose of the MMP to make access to medical marijuana easier for patients. (*Baniani*, *supra*, 229 Cal.App.4th at p. 61.)

These cases endorse a conception of a medical marijuana collective or cooperative protected by section 11362.775 according to which day-to-day business operations can involve buying from grower members and selling to consumer members, so long as all members are patients or primary caregivers, all the buying and selling is done on a nonprofit basis within the collective or cooperative, there are no transactions with nonmembers, and the amount cultivated is reasonably necessary for the membership's medical needs. The same conception is reflected in the California Attorney General's Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use (Aug. 2008) (Guidelines),[4] which were developed pursuant to section 11362.81, subdivision (d).

Under the Guidelines, a medical marijuana cooperative must be organized as a cooperative corporation under the Corporations Code or the Food and Agricultural Code. By statute, a cooperative corporation can have earnings, but these "must be used for the general welfare of its members or equitably distributed to members in the form of cash, property, credit or services." Further, "[c]ooperatives should not purchase marijuana from, or sell to, non-members; instead, they should only provide a means for facilitating or coordinating transactions between members." (Guidelines, § IV(A)(1), p. 8.) Collectives, unlike cooperatives, do not exist as statutory corporate entities, but "as a

---

[4] <http://www.ag.ca.gov/cms_attachments/press/pdfs/n1601_medicalmarijuana guidelines.pdf> (as of Jan. 9, 2015).

21.

practical matter" they "might have to organize as some form of business to carry out [their] activities." These, similarly, "should not purchase marijuana from, or sell to, non-members; instead, [they] should only provide a means for facilitating or coordinating transactions between members." (Guidelines, § IV(A)(2), p. 8.) The Guidelines thus presuppose that the section 11362.775 defense applies to business organizations and their members who engage in financial transactions for marijuana, if the necessary criteria (there is a cooperative or collective, all members are qualified patients or caregivers, transactions are only among members, the amount cultivated is not excessive) are satisfied.

We agree with the view of section 11362.775 taken by the Guidelines and expressed by our colleagues in other districts. The MMP's goal of promoting the orderly and lawful cultivation and distribution of medical marijuana through nonprofit patient-owned-and-operated cooperatives and collectives would not be served by an artificially constrained conception of those entities, according to which they cannot use ordinary business methods or a practical division of labor. As will be seen, under the particular facts and circumstances of this case, the jury instructions given on the cooperative/collective defense were misleading in light of the view of the law that we share with the existing authorities.

## II.    *Jury instructions on the cooperative/collective defense under section 11362.775*

As indicated above, the jury instructions stated that the elements of the cooperative/collective defense are (1) an association of qualified patients to cultivate medical marijuana collectively or cooperatively; and (2) an amount of marijuana possessed or cultivated that did not exceed the needs of the patients of the collective. Anderson maintains that these instructions were inadequate because they failed to explain that a collective or cooperative formed to cultivate medical marijuana lawfully need not consist of members who all share in the work of cultivation, as opposed to some members who contribute their labor and others who contribute money. In light of all the facts and

22.

circumstances of this case, we agree that the instruction was inadequate for this reason, and that the omission of an instruction clarifying the issue was prejudicial.

No objection to the instruction given, and no request for a more complete instruction, was made in the trial court. Under Penal Code section 1259, however, it is appropriate to address the issue despite the lack of preservation. Penal Code section 1259 provides that instructional error not preserved for appeal by objection in the trial court may nevertheless be addressed on appeal if the error affects the defendant's substantial rights. As we will explain, there is a reasonable probability that Anderson would have obtained a better outcome absent the error, so his substantial rights were affected. (*People v. Elsey* (2000) 81 Cal.App.4th 948, 953, fn. 2 [prejudicial error affected defendant's substantial rights within meaning of Pen. Code, § 1259]; *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 [same].)

In a criminal trial, the court must give an instruction requested by a party if the instruction correctly states the law and relates to a material question upon which there is evidence substantial enough to merit consideration by the jury. (*People v. Avena* (1996) 13 Cal.4th 394, 424; *People v. Wickersham* (1982) 32 Cal.3d 307, 325, overruled on other grounds by *People v. Barton* (1995) 12 Cal.4th 186, 201.) Even without a request, the court is required to give correct jury instructions on the general principles of law relevant to issues raised by the evidence. (*People v. Michaels* (2002) 28 Cal.4th 486, 529-530.)

The court has no duty to give an instruction if it is repetitious of another instruction the court gives. (*People v. Turner* (1994) 8 Cal.4th 137, 203) "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."'" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) Failure to give an instruction, even if it was required under the above principles, warrants reversal only if there is a reasonable probability that the defendant would have obtained a more favorable outcome if it had been given. (*People v. Breverman* (1998) 19 Cal.4th 142, 178.)

In this case, the court was required to give instructions on the defense afforded by Health and Safety Code section 11362.775, and it did so. In light of the evidence, however, the instructions it gave did not go far enough and did not give the jury enough information to make a rational decision about whether or not the defense was established. There was evidence that Anderson grew marijuana for Foothill Care Collective, that he was a patient member of that collective, and that he received money through it from other patient members for the marijuana he grew. There also was evidence that Anderson was in the process of forming a new collective or cooperative, in which he would be the only grower, while the other patient members would reimburse or compensate him with money. The words of the instruction, referring to collective cultivation, failed to express the idea that collectives organized in the way the evidence suggested could be lawful.

Under the circumstances, the instructions' failure to express this idea was not harmless, for with an appropriate instruction, it is reasonably probable that the jury would have found it had a reasonable doubt in favor of Anderson regarding whether the elements of his section 11362.775 defense had been established, and would have gone on to find a reasonable doubt as to his guilt on the charge of unlawful cultivation. Several considerations support this conclusion. First, the prosecutor insisted that taking money for marijuana, regardless of whether the transaction is called sales or consignment, is categorically unlawful. This is incorrect, for, as we have said, collectives and cooperatives that operate on a basis of monetary exchange can be lawful under section 11362.775. There was no objection by counsel and no correction by the court, and the jury instructions contained nothing that contradicted the prosecutor's view, so there is good reason to think that view was accepted by the jury. The prosecutor also stressed that the other members of the collective Anderson was in the process of forming did not work in the garden, incorrectly implying—again without objection by defense counsel or correction by the court—that this necessarily meant the cooperative/collective defense did not apply. The jurors could easily have been misled by this, and the

24.

instructions given—referring to collective cultivation—would have reinforced their mistaken impression.

If the jury had found that Anderson raised a reasonable doubt about whether the defense applied, its next task under the instructions would have been to decide whether the prosecution proved beyond a reasonable doubt that it did not. Yet the prosecution's case on this point was not the strongest. This is the second consideration supporting our view that the instructional error was not harmless. There was no evidence of sales to anyone except the consignment sales through Foothill Care Collective, which was not shown to be anything other than a lawful collective to which Anderson belonged. No individuals except those who testified at trial were even alleged to be prospective buyers or recipients of Anderson's marijuana, and there was evidence that they were qualified patients in the process of forming a collective with Anderson within the meaning of section 11362.775. The prosecution's case depended on inferences that Anderson was not really forming a collective because the paperwork was not complete, that Foothill Care Collective was not legitimate because it had been raided, and on Detective Erhardt's estimate of the potential yield of the garden, which vastly exceeded Conrad's estimate. A correctly instructed jury would have needed to consider this case and its weaknesses carefully, as it could not have relied on the prosecutor's overly broad statements about the illegality of marijuana sales.

Finally, the likelihood of a better outcome for Anderson absent the incomplete instruction is indicated by the nature of the verdict. The combination of a guilty verdict on the cultivation count and a hung jury on the possession-for-sale count suggests that the jury had trouble sorting out the law. The jury's failure to agree on possession for sale is surprising given its agreement on cultivation, for the prosecution's primary theory was that Anderson was guilty of cultivation because he was growing marijuana with the intent to sell it unlawfully. The jury's inability to agree on the one count even as it agreed on

the other could well have arisen from confusion over when it is lawful to cultivate and receive money for cultivating marijuana as part of a medical collective.

We do not mean to suggest that the verdict necessarily was inconsistent. It would be logically possible to find, for instance, that Anderson had no intent to engage in any unlawful sales, but still cultivated more marijuana than was reasonably necessary for the medical needs of himself or any collective he belonged to. But, although this is possible, it remains reasonably probable that the verdict arose from confusion rooted in the jury instructions.

In summary, a critical issue in this case was whether the cooperative/collective defense of section 11362.775 applied given evidence of the financial nature of Anderson's involvement with Foothill Care Collective and evidence that his new collective would similarly involve Anderson cultivating on behalf of others who would pay him. Saying merely that collective cultivation can be lawful, the jury instructions left the jurors to their own devices in figuring out how the law treats collectives of the kind indicated by the evidence here. In this, the instructions were prejudicially erroneous.

If the People should decide to retry Anderson on the cultivation count, we will leave it to the court and parties to determine, in light of the evidence, the precise language of instructions that must be given on the cooperative/collective defense. At a minimum, however, the instructions must explain that, in a lawful cooperative or collective, members need not necessarily participate personally in cultivation or any other particular duties, and that the exchange of marijuana for money does not, by itself, make a transaction unlawful within a collective or cooperative.

In addition to the above, Anderson also argues that the jury instructions were erroneous because they did not require the jury to determine whether or not the collective was a nonprofit enterprise. We need not address this question, as we are reversing for another reason, but in any event we do not see how any such error would have been prejudicial. A lawful cooperative or collective must indeed be a nonprofit enterprise

under section 11362.775, but specifying this element in the jury instructions could only have helped the People, not Anderson.

## III.    *Destruction of evidence*

Anderson argues that the trial court erred when it denied his motion to dismiss on account of the alleged failure of the sheriff's department to preserve evidence pursuant to section 11479. He claims that the sheriff's department failed to comply with the statute and deprived him of due process of law.

Anderson's motion claimed the sheriff's department did not comply with the statutory requirements for preserving samples and did not make samples available to the defense, but the People's opposition claimed it did comply and that the preserved evidence was available for inspection. At the hearing, defense counsel did not deny that the defense could have inspected the evidence. Instead, he argued that the People had not proved that the samples were representative—an implicit concession that samples existed and were accessible to the defense. Anderson also argued that the affidavit filed by the sheriff's department did not satisfy the statutory requirements.

We need not decide whether there was full compliance with the preservation and affidavit requirements of section 11479. For the sake of argument, we will assume that the People had the burden of proving compliance and that they did not prove it. It remains to be determined whether Anderson has carried his burden of demonstrating prejudice. (*People v. Coley* (1997) 52 Cal.App.4th 964, 972 [appellant has burden of showing appellate court both error and prejudice].)

Anderson says he was prejudiced because an important factual issue for his defense was whether the quantity of marijuana he was growing was more than a reasonable amount for his medical needs and/or the needs of his asserted collective. He says the sex, quality, and maturity of the plants were all factors contributing to the amount of usable marijuana the plants ultimately would yield. Without adequate samples, he

27.

contends, he was deprived of the opportunity to rebut fully the People's claim that the quantity was too large.

This argument presupposes that the samples preserved were not sufficient for these purposes. But even if (as we are assuming) the samples did not fully comply with the statute, it does not necessarily follow that they could not have been used to support exculpatory conclusions about the garden's yield. Conrad's testimony revealed that the defense chose to forgo the opportunity to examine the samples. If it had examined them, it could have made a determination about whether they were adequate for evidentiary purposes. Since it decided not to do this, Anderson is now unable to show that any error in the sampling process was harmful to his case.

## *DISPOSITION*

The judgment is reversed and the case is remanded to the trial court for further proceedings.

_____
Gomes, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Oliver, J.*

_____

* Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28.