Filed 5/26/21  P. v. Derouen CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E072796 |
| v. | (Super.Ct.No. RIF1604075) |
| CHAD EARL DEROUEN, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Bernard Schwartz, Judge. Affirmed.

Eric E. Reynolds, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

1

After hearing evidence the police found over 280 marijuana plants and an electric meter bypass in Chad DeRouen's home, the jury convicted him of unlawfully cultivating marijuana and stealing utility services (a misdemeanor and a felony, respectively). On appeal, DeRouen challenges his marijuana conviction on the ground the trial court erroneously denied him an opportunity to present a collective cultivation defense under the Medical Marijuana Program Act (MMPA). (Health & Saf. Code, § 11362.7 et seq.) He also raises two challenges to his sentence, arguing the trial court (1) incorrectly determined he owed the electric company $46,148.96 in restitution and (2) violated his due process rights as articulated in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) by imposing various fees and a restitution fine without first determining his ability to pay. We conclude each of these arguments lacks merit and affirm.

## I

## FACTS

### A.    *Prosecution's Case*

On August 16, 2016, two Riverside County deputy sheriffs executed a search warrant at DeRouen's Perris home based on information he might be running an indoor marijuana grow operation. Inside his garage, the deputies found 220 marijuana plants, several fans, a large appliance that was either an air conditioner or $CO_2$ generator, and 16 grow lights with 1000-watt bulbs. The plants were between five and six feet tall and in the final budding stage. Inside one of the bedrooms, they found 64 smaller marijuana plants (three to five feet tall), fans, and grow lights. They didn't find any evidence of

2

marijuana consumption (smoking devices or spent marijuana) but they did find a surveillance system, digital scale, and several trash bags containing harvesting byproduct (marijuana leaves and stems).

One of the deputies testified at trial. He said a single indoor plant typically yields about a quarter to a half a pound of marijuana. He also said the trash bags full of leaves and stems suggested DeRouen had been growing for a while, at least long enough to have harvested a previous crop.

The same day the deputies executed the warrant, a revenue protection investigator from Southern California Edison inspected DeRouen's home. Inside the drywall in the garage the investigator found an electric meter bypass, an illegal device that diverts electricity around the meter so the customer receives electricity without the utility's knowledge. Using amp clamps to measure the electricity being fed to the home, the investigator estimated DeRouen was receiving 323,712 undetected kilowatts of electricity per day, which resulted in a loss of revenue to Edison of $3,010.50 a month. Based on his review of the billing records for DeRouen's home, the investigator concluded the bypass had been running since August 2014, resulting in a total loss of $72,252.52.

The investigator testified that this wasn't the first time he'd found an electrical bypass at DeRouen's home. He said about two years earlier, in August 2012, he suspected something was amiss when Edison had received signals from DeRouen's meter on three separate occasions, despite the fact his electricity had been shut off the previous

3

month. Sure enough, when he inspected DeRouen's home on August 24, 2012, he found a bypass and removed it.

B.     *Defense Case*

DeRouen testified that he suffered from narcolepsy, cataplexy, and migraines, and a doctor had given him a medical marijuana recommendation to treat these conditions. He said the doctor had also given him two grow recommendations—one for 15 plants and another for 99 plants. At the time of his arrest, he was smoking about seven grams a day.

DeRouen said he had been growing 90 plants, not 284 as the deputies had claimed. He said this was his first grow and he was doing it for his own personal use. He expected his plants to yield only about six to eight pounds and had no intention of selling any of it.

He denied knowing there had been a bypass at his home in 2016. When he started his operation in July 2016, he hired a man named Jeremy to set up the electrical wiring for his grow rooms. He had noticed the bypass panel after Jeremy left but didn't know what it was. As for the 2012 bypass, he said his friend Kenny had installed it without his permission when he wasn't home. When he returned home, he saw what Kenny had done and knew it was illegal, but didn't know how to remove it, and the Edison inspector had shown up the next day and taken it anyway.

A man named Giovanni who was employed by a heating and air conditioning company testified that he'd performed work at DeRouen's house in March 2015 and didn't recall seeing any marijuana plants.

William Britt, a patient advocate and expert on medical marijuana and indoor grow operations, testified that he believed DeRouen was an amateur grower. He said that after reviewing photographs of DeRouen's operation, he had concluded there were less than 284 marijuana plants. He explained that while an expert operation usually yields about a pound of marijuana for every 1,000-watt grow light, amateurs produce much less because they are inexperienced with preventing pests, mold, and other issues that decrease yield. He said it takes an average of four months to grow a crop of plants, and amateurs often grow more plants than they need for personal use because of the high loss rate. Finally, he said a patient like DeRouen who smokes seven grams of marijuana a day would consume about 5.6 pounds in a year.

C.      *Rebuttal*

A Riverside County sheriff's investigator testified as an indoor grow expert for the prosecution. He disagreed with Britt's opinion that DeRouen was an amateur grower. He said that in 80 to 90 percent of the unlawful cultivation cases he's seen, the grower had been using an electrical bypass. In this case, DeRouen had a bypass in addition custom electrical wiring and a significant amount of plants and lighting. He concluded DeRouen's confiscated crop would have yielded 142 to 284 pounds of marijuana and that DeRouen had grown at least one previous crop. Finally, he said heavy marijuana users consume about three to five grams a day.

D.    *Verdict and Sentencing*

The jury convicted DeRouen of felony theft of utility services valued at more than $950 (Pen. Code, § 498, subd. (d)) and misdemeanor cultivation of marijuana (Health & Saf. Code, § 11358, unlabeled statutory citations refer to this code). The trial court denied DeRouen's motion to reduce the felony theft conviction to a misdemeanor (Pen. Code, § 17, subd. (b)) and placed him on three years felony probation, on the conditions he serve 180 days in the work release program, pay various fines and fees, and refrain from cultivating marijuana (though he could still possess and consume it for medical purposes). The fines and fees the court imposed were $46,148.96 in victim restitution to Southern California Edison, a $60 conviction fee (Gov. Code, § 70373), an $80 court operations fee (Pen. Code, § 1465.8), and a $514.58 booking fee (Gov. Code, § 29550).[1]

## II

## ANALYSIS

A.    *The Collective Cultivation Defense*

Before trial, the court held an Evidence Code section 402 hearing to determine whether DeRouen had sufficient evidence to present a compassionate use defense and a collective cultivation defense to the jury. The court concluded DeRouen's offer of proof was sufficient to present the first defense but not the second. DeRouen argues this was error and that he carried the minimal evidentiary burden required to present a collective cultivation defense. We disagree.

---

[1] The court also imposed a $600 restitution fine (Pen. Code, § 1202.4) but ordered it stayed pending successful completion of probation.

### 1. *Applicable legal principles*

The MMPA recognizes a qualified right to collectively cultivate medical marijuana for medical purposes and on a nonprofit basis. The defense, commonly called "collective cultivation," applies when the defendant can "show that members of the collective or cooperative: (1) are qualified patients who have been prescribed marijuana for medicinal purposes, (2) collectively associate to cultivate marijuana, and (3) are not engaged in a profit-making enterprise." (*People v. Jackson* (2012) 210 Cal.App.4th 525, 529 (*Jackson*).)

CALCRIM No. 3413, the jury instruction for the defense, requires the defendant to show: (1) they and *all members* of the collective or cooperative are either qualified patients or primary caregivers of qualified patients; (2) all members must collectively or cooperatively associate to cultivate marijuana *for medical purposes only*; and (3) the marijuana cultivated must be in only that amount which is reasonably related to the members' own personal medical needs *and may not be cultivated for profit*.

CALCRIM No. 3413 also provides the following factors the jury may consider when deciding whether a collective meets the requirements of the MMPA: the size of the collective's membership, volume of purchases, level of members' participation, whether the collective was formally established as a nonprofit, presence of financial records, accountability of the collective to its members, and evidence of profit or loss.

In short, the collective cultivation defense protects medical marijuana cooperatives and collectives that operate in a closed loop, where grower members cultivate marijuana

7

to sell to consumer members, "so long as all members are patients or primary caregivers, all the buying and selling is done on a nonprofit basis within the collective or cooperative, there are no transactions with nonmembers, and the amount cultivated is reasonably necessary for the membership's medical needs." (*People v. Anderson* (2015) 232 Cal.App.4th 1259, 1277-1278.) As the Attorney General's "Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use" advise, "[n]othing allows marijuana to be purchased from outside the collective or cooperative for distribution to its members. Instead, the cycle should be a *closed-circuit of marijuana cultivation and consumption with no purchases or sales to or from non-members*. To help prevent diversion of medical marijuana to non-medical markets, collectives and cooperatives should document each member's contribution of labor, resources, or money to the enterprise. They should also track and record the source of their marijuana." (Guidelines, § IV.B.4., p. 10, italics added; see also *People v. London* (2014) 228 Cal.App.4th 544, 554 (*London*) [noting the Attorney General's guidelines are not binding on courts but "are entitled to 'considerable weight'"].)

DeRouen is correct that the burden a defendant must carry to present an affirmative defense to the jury is relatively minimal. They must present enough evidence to simply "raise a reasonable doubt as to whether the elements of the defenses have been proven," and "'the trial court must leave issues of witness credibility to the jury.'" (*Jackson*, *supra*, 210 Cal.App.4th at p. 533.) "The standard for evaluating the sufficiency of the evidentiary foundation is whether a reasonable jury, accepting all the evidence as

8

true, could find the defendant's actions justified by" the collective cultivation defense. (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1539 (*Trippet*).) Because this inquiry is a legal one, not a factual one, we independently review the record to determine whether DeRouen satisfied the evidentiary threshold. (*Ibid.*) Independent review is also appropriate because DeRouen's challenge has a constitutional dimension. He argues the trial court's evidentiary ruling violated his right to "a meaningful opportunity to present a complete defense." (*California v. Trombetta* (1984) 467 U.S. 479, 485; *People v. Seijas* (2005) 36 Cal.4th 291, 304 [de novo review applies to "determinations affecting constitutional rights"].)

### 2. *Additional facts*

Before trial, DeRouen's counsel subpoenaed documents from Mr. Stewart, who purportedly worked at Mo Val Wellness Center. Counsel believed the documents would confirm this entity was a marijuana collective and would shed light on the collectives policies, procedures, and membership. He also hoped they would demonstrate DeRouen's status as a grower member.

The documents Mr. Stewart produced consisted of articles of incorporation for Mo Val Wellness Center plus about 100 membership applications, which contained copies of the applicants' driver's licenses, medical marijuana cards, and other confidential information. The court reviewed the applications in camera and concluded there was no good cause to release the applications to the defense. It suggested defense counsel re-

9

subpoena the documents in a redacted form or try to interview members of Mo Val Wellness Center directly.

Defense counsel subpoenaed Mr. Stewart a second time, this time requesting redacted versions of "one dozen application documents, including any medical marijuana cards, as well as any primary caregiver registration forms, for individuals who are members of the [Mo Val] Wellness Center on or about August 2016." In response, Mr. Stewart produced 12 member registration forms—10 of which were on letterhead labeled "215 Shop (Free Choice Healing Center, Inc.)" and two of which didn't identify any particular collective. All but one of the forms were completed after DeRouen's arrest on August 16, 2016. Because the forms contained no private medical or identifying information, the court released them to the defense.

At the evidentiary hearing, DeRouen's counsel called Mr. Stewart to testify as the owner of Mo Val Wellness Center and its custodian of records. Counsel represented that Mr. Stewart would be able to explain that Mo Val Wellness Center had changed its name to Free Choice Living. However, Mr. Stewart asserted his Fifth Amendment right against self-incrimination and refused to testify about anything except the documents he had produced. (RT 233-234, 308-310.) However, even about the documents, all he could say was that he had put them in a file after receiving them. He didn't know when or how they had been prepared. Following Mr. Stewart's testimony, the court ruled the redacted applications were hearsay and inadmissible because Mr. Stewart hadn't provided enough information to apply the business records exception.

10

DeRouen then testified in an attempt to supply the requisite evidence for a collective cultivation defense. He said he had a medical marijuana recommendation from his physician to treat various medical conditions and that, in May 2015, he had become a member the marijuana collective Mo Val Wellness Center. He said the collective had hundreds of members. He also said that around the same time he'd become a member, he reached an oral agreement with Mr. Stewart to grow marijuana for the collective. He said they agreed that the only compensation he'd receive was to keep some of the marijuana for his own use.

The rest of DeRouen's testimony was, at best, confusing. He said he had initially thought Mr. Stewart ran Mo Val Wellness Center, but it turned out he actually ran an entity called Free Choice Healing Center, which was not a marijuana collective, but rather a company that provided therapeutic and wellness services like massages and wellness evaluations to its patients. DeRouen said Free Choice Healing Center then became a collective after Mo Val Wellness Center switched management sometime in 2015 or mid-2016. But he also said Mo Val Wellness Center had been renamed Free Choice Healing Center after it was shut down. He didn't know how Free Choice Healing Center operated or when it became a collective or nonprofit.

Next, defense counsel called a physician who said he had given Mr. Stewart a medical marijuana recommendation to treat chronic cancer-related pain.

At the conclusion of the hearing, the trial court ruled that DeRouen had not met the threshold requirement to present a collective cultivation defense but had produced

11

enough evidence to present a compassionate use defense. The court reasoned that although it was possible to have a collective with only two members (DeRouen and Mr. Stewart), DeRouen hadn't produced any evidence to satisfy the second or third elements of the defense: that the members of the collective were working together to cultivate marijuana for their medical purposes only and that the amount grown was reasonably related to their medical needs.

### 3. *Discussion*

DeRouen argues this ruling was error. He claims he satisfied the evidentiary threshold for presenting the defense by testifying that he was a qualified patient and member of the Mo Val Wellness Center collective (which had hundreds of members) and that he had an agreement with Mr. Stewart to grow marijuana for the collective for no payment except the marijuana he kept for himself. But even accepting this evidence as true as the standard requires, it falls short of establishing a prima facie case that the defense applies. (*Jackson*, *supra*, 210 Cal.App.4th at p. 533; *Trippet*, *supra*, 56 Cal.App.4th at p. 1539.)

As the trial court correctly observed, DeRouen provided no evidence regarding the second and third elements of the defense. Nothing in his testimony would allow a jury to find the amount of marijuana he was growing for the collective was for members only and was reasonably related to their personal medical needs. Similarly, nothing in his testimony would allow a jury to find the price the collective charged customer members for the marijuana was used to cover growing and distribution costs only, and did not

12

create profits. Crucially, DeRouen presented no evidence about how much marijuana Mr. Stewart or any of the other members required to treat their medical needs. And, because Mr. Stewart invoked his Fifth Amendment right, DeRouen was not able to present any evidence about Mo Val Wellness Center's or Free Choice Healing Center's cultivation policies. (*London*, *supra*, 228 Cal.App.4th at p. 555.)

The cases DeRouen relies on do not convince us otherwise. *Jackson* and *People v. Colvin* (2012) 203 Cal.App.4th 1029 are inapplicable because the error in those cases was a legal one—the trial courts in those cases applied an incorrect definition of the collective cultivation defense. (*Jackson*, *supra*, 210 Cal.App.4th at pp. 529-530 [trial court mistakenly believed the defense applied only if *every* collective member actively participates in the *cultivation* process]; *Colvin*, at p. 1037 [trial court incorrectly concluded the defense applied only to the act of cultivation and not to the necessary and related acts of transportation and distribution].) The trial court made no legal error here.

And finally, *People v. Urziceanu* (2005) 132 Cal.App.4th 747 is distinguishable because there the defendant had presented precisely the kind of details about the collective's cultivation policies and operations that DeRouen failed to produce. (See *id.* at p. 786 [noting the defendant had "presented evidence of the policies and procedures FloraCare used in providing marijuana for the people who came to him, including the verification of their prescriptions and identities, the fact that these people paid membership fees and reimbursed the defendant for costs incurred in the cultivation through donations . . . [as well as] evidence that members volunteered at the

13

cooperative"].) Because DeRouen presented insufficient evidence that the collective cultivation defense applied to him, we conclude the trial court did not violate his constitutional right to a meaningful opportunity to present a defense.

B. *Victim Restitution*

DeRouen argues the court lacked a rational basis for concluding he stole 45,157.50 in electricity from Edison and ordering him to pay that amount in restitution.[2] Again, we disagree.

1. *Additional facts*

At the restitution hearing, Edison claimed a loss of $72,252.52 as a result of DeRouen's theft. They based this amount on their conclusion that he stole $3,010.50 worth of electricity each month the bypass was operational, and it had been operational for two years—from August 2014 to August 2016. The prosecution argued Edison's claim was based on reliable evidence; namely, the amp clamp measurement and the investigator's review of DeRouen's billing records.

Defense counsel argued the evidence showed DeRouen stole, at most, $6,000 worth of electricity. DeRouen's ex-girlfriend testified at the hearing that the grow the police found at his home had been his first, and DeRouen's counsel submitted receipts showing DeRouen had bought items for the grow in April 2016.[3] Counsel also reminded

_____

[2] The restitution order also included $991.46 for Edison's investigative costs, for a total of $46,148.96, but DeRouen doesn't challenge this aspect of the order.

[3] DeRouen's ex-girlfriend was tried on the same charges as DeRouen (under an aiding and abetting theory), but the jury acquitted her of both counts.

14

the court of Giovanni's trial testimony that he hadn't recalled seeing any marijuana plants at DeRouen's home when he performed work there in March 2015. He argued this evidence showed the grow had been in effect for only two or three months, not two years.

The court and the parties then discussed DeRouen's billing records at length in an attempt to determine when the bypass had started. The prosecution argued DeRouen's average daily kilowatt use indicated he had been using a bypass as far back as 2012. The court ultimately concluded that while it was impossible to know precisely when the theft had begun, there was substantial evidence to support a finding that DeRouen had started using a bypass sometime between May and June 2015 at the latest, which meant he had been stealing electricity for 15 months. Because DeRouen had not contested Edison's claim of monthly loss ($3,010.50), the court determined he had stolen approximately $45,157.50 of electricity.

2.     *Discussion*

The California Constitution contains a "broad . . . mandate . . . that restitution must be imposed 'in every case . . . in which a crime victim suffers a loss.' " (*People v. Giordano* (2007) 42 Cal.4th 644, 655, citing Cal. Const. art. I, § 28, subd. (b).) To implement this constitutional directive, our criminal restitution statute, Penal Code section 1204.4, "allows for recovery of a broad variety of economic losses that are incurred as a result of the defendant's criminal conduct." (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1046.) A victim's right to restitution under this statute must be "broadly and liberally construed." (*People v. Mearns* (2002) 97 Cal.App.4th 493, 500.)

15

Where, as here, the restitution is for theft, the victim's statements about the value of the stolen property constitute prima facie evidence of the property's worth for purposes of restitution. (*People v. Prosser* (2007) 157 Cal.App.4th 682, 690 (*Prosser*).) Once the victim has made a prima facie showing of the value of the loss, "the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim." (*Id.* at p. 691; see also *ibid.* [placing the burden of proof on the defendant is fair because "the situation is one of the thief's own making, and as between the victim and the thief, the equities favor the victim"].)

We review a trial court's restitution order for abuse of discretion and will uphold it so long as there is "'a factual and rational basis for the amount.'" (*People v. Baker* (2005) 126 Cal.App.4th 463, 467.) "'In reviewing the sufficiency of the evidence, the '"power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings." [Citations.] Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt. . . . We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact."' (*Prosser*, *supra*, 157 Cal.App.4th at pp. 686-687.)

DeRouen argues there is insufficient evidence to support the restitution amount because the court's conclusion that bypass began mid-May 2015 was the product of speculation. He points to the evidence he produced at the restitution hearing to argue the

16

only rational conclusion to be drawn from this record is that bypass began just a few months before the police discovered the grow operation. This argument contradicts the applicable standard of review and overlooks the evidence supporting the trial court's conclusion.

The trial court was not required to accept DeRouen's or Edison's statements about when the bypass began. Instead, it conducted its own analysis of the evidence and arrived at something of a middle ground, concluding the bypass had been running for 15 months instead of two years or two months. That conclusion was grounded in the record. According to the prosecution's witnesses, the plants at DeRouen's home were in the final budding stages of the (four-month) grow cycle, and the trash bags containing harvest byproduct indicated DeRouen had grown at least one previous harvest. And, according to DeRouen's own testimony, he reached a verbal agreement with Mr. Stewart to grow marijuana for Mo Val Wellness Center right about the same time he'd joined the collective, in May 2015. In addition, DeRouen's electricity bill for May 2015 was extremely low and, in the months that followed, his usage patterns were erratic. The court interpreted the drastic swings in DeRouen's electricity usage as further support the bypass had been operating during that time. This evidence (indeed, DeRouen's testimony on its own) provided a rational and factual basis to conclude he began using a bypass in May 2015 when he joined Mo Val Wellness Center.

C.    *Dueñas and Ability to Pay*

DeRouen argues we must reverse the $600 restitution fine and the three fees (conviction, court operations, and booking) and remand for an ability-to-pay hearing in accordance with the holding in *Dueñas*. The problem with this challenge is DeRouen failed to raise any objection to the fines and fees during his sentencing hearing, despite the fact *Dueñas* had been issued months earlier. While we traditionally excuse the failure to object where an objection "would have been futile or wholly unsupported by substantive law then in existence" (*People v. Welch* (1993) 5 Cal.4th 228, 237), DeRouen cannot argue his failure to object would have been futile because he had the benefit of the *Dueñas* opinion when his sentence was imposed. We therefore conclude the argument is forfeited. (See, e.g., *People v. McCullough* (2013) 56 Cal.4th 589, 593 [the failure to object in the trial court forfeits a claim on appeal, even claims based on constitutional rights]; *People v. Keene* (2019) 43 Cal.App.5th 861, 864 ("The concept of forfeiture for failure to raise ability to pay fines, fees or assessments is well established in our case law"].)

Plus, even before *Dueñas*, defendants had a statutory right to object to a restitution fine above the $300 minimum, and so, *Dueñas* aside, it would not have been futile for DeRouen to object to the $600 restitution fine (which the court stayed anyway). (Pen. Code, § 1202.4, subd. (d) [in considering a defendant's inability to pay as a factor in setting the amount of the fine in excess of the minimum fine, "[c]onsideration of a defendant's inability to pay may include his or her future earning capacity"]; see also

18

*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 [even pre-*Dueñas*, a defendant forfeits their challenge to a restitution fine over the statutory minimum by failing to object].) That leaves $654.58 in fees that DeRouen could have objected to, but didn't. Considering defense counsel's assurance during the hearing that his client would be seeking employment as soon as possible, and given that the fee amount is relatively minimal and DeRouen is relatively young (in his early 40s), we would nevertheless conclude that any due process violation was harmless because the record demonstrates beyond a reasonable doubt he will be able to pay the fees with future earnings. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.)

## III

## DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

19